UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ELDER CARE PROVIDERS OF INDIANA, INC., | ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | 1:14-cv-01894-SEB-MJD |
| vs. | ) ) | |
| HOME INSTEAD, INC., | ) ) | |
| Defendant. | ) ) | |
| _____ | ) ) | |
| HOME INSTEAD, INC., | ) ) | |
| Counter Claimants, | ) ) | |
| | ) | |
| vs. | ) ) | |
| ANTHONY  SMITH, GEORGETTE  SMITH, HOME AGAIN SENIOR CARE, INC., ELDER CARE PROVIDERS OF INDIANA, INC., | ) ) ) ) ) | |
| | ) | |
| Counter Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR PRELIMINARY INJUNCTION**

This cause is before the Court on the Motion for Preliminary Injunction [Dkt. No.

59] filed by Defendant Home Instead, Inc. on February 17, 2015, pursuant to Rule 65(a) of

the Federal Rules of Civil Procedure.  Having considered Home Instead's motion, the briefs

submitted by the parties, and the parties' September 8, 2015 oral arguments, the Court

hereby GRANTS in PART and DENIES in PART the Defendant's motion for injunctive relief.

## Factual Background

This case involves claims for breach of a franchise agreement. Defendant Home Instead, Inc. ("Home Instead") operates a business that provides non-medical care to senior citizens through a network of independently-owned franchises. On October 16, 2006, Plaintiff Elder Care Providers of Indiana, Inc. ("Elder Care") entered into a franchise agreement with Home Instead in which Elder Care agreed to operate the Home Instead business within an exclusive area on the east side of Indianapolis, Indiana for a period of ten years ("Franchise Agreement"). Elder Care's sole shareholders – Anthony and Georgette Smith – personally guaranteed the Franchise Agreement. [Dkt. No. 1-1 (Franchise Agreement).]

Elder Care provided non-medical home care to seniors and was not allowed (both by its Franchise Agreement and Indiana licensure restrictions) to provide any medical care because it was licensed as a PSA (personal service agency), rather than an HHA (home health agency). HHAs are permitted to attend to home-based medical needs. Elder Care thus was required to refer its clients who were in need of medical care to HHAs to have their medical needs met. In November 2011, Mr. and Mrs. Smith formed Home Again Senior Care, Inc. ("Home Again"), a separately licensed HHA corporation through which

medical home health care was provided to clients referred to it by both Elder Care and other area Home Instead franchises.[1]

Not until March 2013 did Home Instead first learn of Home Again's operations, prompting it to voice two concerns:  (1) the possible confusion resulting from the name "Home Again";[2] and (2) the possibility that Home Again might be providing services that competed with Home Instead.  As a result, Home Instead undertook what became a 20-month investigation into Home Again,[3] which focused almost entirely on whether Elder Care was diverting business to Home Again to the detriment of Home Instead.  The Smiths contend that throughout the investigation by Home Instead they were willing to change the name of their HHA (Home Again), although Home Instead notes that their willingness was conditioned on Home Instead's stipulation that Home Again was not in competition with Home Instead, which Home Instead was not willing to do.

---

[1] The Smith Parties contend that they did not believe that Home Again would be competing with Home Instead (or Elder Care), in part because Home Instead encouraged its franchisees to develop partnerships with HHAs to provide complementary services.  [Dkt. No. 86 at 8 (quoting Home Instead's Operations Manual).]  Moreover, the evidence demonstrates that all of the Home Instead franchisees with whom Home Again/Purpose have partnered testified that they could not provide the services provided by Home Again/Purpose because those franchisees can provide only non-medical services.  [*Id.* at 9 (citing franchisee depositions).]

[2] The parties dispute the reason the Smiths named their HHA "Home Again."  The Smiths claim that it was inspired by Jim Neighbors's "Back Home Again in Indiana" singing performances at the Indianapolis 500, while Home Instead points to testimony of Mr. Smith that he desired to have "Home Again" be similar to "Home Instead" so that he could market the two companies together.

[3] The parties dispute the reason that Home Instead's investigation lasted twenty months.  Home Instead argues that the Smiths delayed in providing the documents requested.  [*See* Dkt. No. 60 at 5.]  The Smiths contend that Home Instead prioritized issues other than the Smith Parties and they dispute that they were dilatory in responding to Home Instead's requests for information. [*See* Dkt. No. 86 at 12.]

Home Instead ultimately concluded that the operation of Home Again constituted a breach of the Franchise Agreement's competitive restrictions as well as an infringement on Home Instead's trademark and, as a result, Home Instead terminated the agreement between it and Elder Care.  On November 7, 2014, Home Instead's General Counsel notified the Smiths' attorney that Home Instead planned to terminate Elder Care's franchise agreement and file a federal lawsuit in Nebraska, unless the Smith Parties agreed that (1) Home Again would pay royalties to Home Instead for revenues generated since 2011; (2) Home Again would be consolidated with Elder Care to become a Home Instead franchise; and (3) the Smiths would amend their franchise agreement to transform their business into a medical franchise, and then have 180 days to sell their businesses or face permanent wind-down.  The Smiths did not agree and ultimately the franchise was terminated.

Elder Care continued to operate as a Home Instead franchise until January 31, 2015 allowing time for Elder Care to wind down the business.  According to Elder Care, it stopped operating as a Home Instead franchise during the first week of February 2015. Elder Care insists that it has now returned all Home Instead proprietary materials; in fact, they say, that occurred immediately after Elder Care discontinued operations.  [*See* Dkt. No. 86 at 15; Dkt. No. 145 at 2 ("Elder Care returned all the proprietary material received from Home Instead . . . including operating manuals, training materials, and the like.").]

The Franchise Agreement prohibits Elder Care and the Smiths from using any Home Instead licensed mark for any unauthorized use.  Specifically, the Franchise Agreement provides:

### B.   LIMITATIONS ON FRANCHISEE'S USE OF LICENSED MARKS

Franchisee agrees to use the Licensed Marks as the sole identification of the Franchised Business, provided that Franchisee identifies himself/herself as the independent owner in the manner prescribed by Franchisor. Franchisee must not use any Licensed Mark as part of any corporate or trade name or with any prefix, suffix or other modifying words, terms, designs or symbols, or in any modified form, nor may Franchisee use any Licensed Mark in the sale of any unauthorized product or service or in any other manner not expressly authorized in writing by Franchisor. Franchisee agrees to display the Licensed Marks prominently and in the manner prescribed by Franchisor on signs and forms. Further, Franchisee agrees to give notices of trademark and service mark registrations and copyrights Franchisor specifies and to obtain fictitious or assumed name registrations as may be required under applicable law.

[Franchise Agreement at ¶ 6(B).]   The Franchise Agreement also provides that, after termination of the agreement, Elder Care and the Smiths are required to deliver all materials related to the franchise to Home Instead:

(9)   immediately deliver to Franchisor all Operations Manuals, software licensed by Franchisor, records, files, instructions, correspondence, all materials related to operating the Franchised Business, including, without limitation, agreements, invoices, and any and all other materials relating to the operation of the Franchised Business in Franchisee's possession or control and all copies (all of which are acknowledged to be Franchisor's property), and must not retain any copy or record of any of the foregoing, except Franchisee's copy of this Agreement and any correspondence between the parties and any other documents which Franchisee reasonably needs for compliance with any provision of law; and

[*Id.* at ¶ 17(A).]   The Franchise Agreement also prohibits Elder Care and the Smiths from competing with Home Instead, as follows:

5

09/14    In consideration for this specialized training, Trade Secrets, Confidential Information and rights, Franchisee covenants that during the term of this Agreement and for a period of two (2) years following the expiration or termination of this Agreement, that neither Franchisee nor any of its officers, directors, managers or employees shall, either directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership, corporation or limited liability company:

   (1)    divert, or attempt to divert, any business or customer of the Franchised Business to any competitor, by direct or indirect inducement or otherwise, or to perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Licensed Marks and the System;

   (2)    own, maintain, operate, engage in, or have any financial or beneficial interest (including any interests in any corporations, partnerships, trusts, limited liability companies, incorporated associations or joint ventures) advise, assist, or make loans to, any non-medical companionship and domestic care service business that is of a character and concept similar to

the HOME INSTEAD SENIOR CARE Business. As used in this Agreement, the term "similar" means a business which looks like, copies, imitates or operates in a manner similar to a HOME INSTEAD SENIOR CARE Business, including, but not limited to, any non-medical service business, and which business is, or is intended to be, located at the location of the HOME INSTEAD SENIOR CARE Business. The term "non-medical companionship and domestic care service business" for purposes of this paragraph shall mean companionship and domestic care services which include, but are not limited to, companionship, light housekeeping, meal preparation, errands, incidental transportation, assistance in laundry and other activities for the benefit of the customer, reminders to take medication (both prescription and over-the-counter), assistance in grooming, bathing, personal hygiene, assistance with problems such as incontinence and other personal care services as defined by Franchisor throughout the term of this Agreement.

[*Id.* at ¶ 17(C)(2).]

Elder Care filed the current lawsuit on November 8, 2014 alleging that Home Instead's termination breached the Franchise Agreement and violated the Indiana Deceptive Franchise Practices Act. Home Instead filed a counterclaim against Elder Care, Mr. and Mrs. Smith as well as Home Again (collectively referred to as the "Smith Parties") for breach of contract, civil conspiracy, misappropriation of trade secrets, unfair competition, and trademark infringement.

On May 26, 2015, counsel for the Smith Parties informed Home Instead that Elder Care had executed a Letter of Intent to undertake a complete transfer of Elder Care's clients to a neighboring Home Instead franchisee, Care Choices.   The Transfer Agreement, executed on July 15, 2015, transferred Elder Care's patients to Care Choices for $500,000 ($30,000 down payment within 3 months and 36 monthly payments thereafter).[4]   Home Instead raised various concerns about the legality of the Transfer Agreement in its briefing; however, Home Instead does not seek to unwind the Transfer Agreement.  [Dkt. No. 154 at 2 ("Home Instead, Inc. is not asking the Court to unwind the Transfer Agreement at this point in time.").]   After transferring its clients to Care Choices, Elder Care ceased all business operations.

As of August 26, 2015 Home Again Senior Care Inc.'s legal business entity name became Purpose Home Health Inc.  [Dkt. No. 157-1.]

Although the shifting facts and circumstances in this case reflect the parties' ongoing business activities, Home Instead's current formulation of its request for a preliminary injunction consists of the following; that the Smith Parties:

(1) cease all use of the names Home Instead® and Home Instead Senior Care®;

(2) cease all use of the names Home Again and Home Again Senior Care;

(3) comply with the post-termination covenants, including the covenants against disclosure of confidential information and the covenants prohibiting operating or having any financial or beneficial interest in a non-medical and domestic care service business in Elder Care's former exclusive territory that

---

[4] It is Home Instead's position that the Smith Parties are not entitled to any consideration for the transfer of clients to Care Choices.  [Dkt. No. 142 at 3.]

is of a character and concept similar to a Home Instead Senior Care® business; and

(4) to deliver to Home Instead, Inc. all materials relating to the operation of Elder Care's business, including all copies of those materials, unless the Smith Parties are otherwise required by law to retain copies.

[Dkt. No. 154 at 1.]  We address each of these requests for injunctive relief below.

## Legal Analysis

## Standard of Review

In reviewing a motion for injunctive relief, courts proceed in two distinct phases. First, we must determine whether the moving party has satisfied the threshold showing of entitlement to relief, which in turn consists of three elements: (1) absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims, (2) traditional legal remedies would be inadequate, and (3) its claim has some likelihood of succeeding on the merits. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008); *Annex Books, Inc. v. City of Indianapolis,* 673 F.Supp.2d 750, 753 (S.D. Ind. 2009). If the moving party clears this threshold, we proceed to the second stage, balancing "the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest.'" *Lawson Prods., Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1433 (7th Cir. 1986).

Our balancing of these equitable factors is not rigid or formulaic; rather, we employ a "sliding scale" approach – meaning, for example, that "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh

towards its side." *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir. 1992) (citations omitted). The sliding scale approach "is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 895–896 (7th Cir. 2001) (quoting *Abbott Labs.,* 971 F.2d at 12).

Although discretion to issue a preliminary injunction lies with the courts, injunctive relief it is to be considered an "extraordinary remedy," appropriate only on a "clear showing of need." *See Sierra Club v. Gates,* 499 F.Supp.2d 1101, 1126 (S.D. Ind. 2007). The moving party bears the burden of proof and must establish by preponderance of the evidence that he is entitled to the requested relief. *Id.*

## Discussion

**I.    The Smith Parties' Use of Home Instead-Related Names and Return of Home Instead-Related Documents.**

Home Instead seeks an order requiring the Smith Parties to cease using the names Home Instead, Home Instead Senior Care, Home Again, and Home Again Senior Care. Additionally, Home Instead requests that the Court require the Smith Parties to deliver to it all business-related materials pertaining to the operation of Elder Care's business, including copies,[5] unless the Smiths are required by law to retain copies. We hold that Home Instead has satisfied its burden of demonstrating that it has a reasonable likelihood

---

[5] Because this matter is in litigation, although the Smith Parties are ordered turn over all documents related to Elder Care's business, many of these documents may be part of discovery and court filings and thus copies may be retained by the Smith Parties and/or their lawyers.

of success on the merits of its claim for breach of Franchise Agreement and will suffer irreparable harm for which there is no adequate remedy at law absent a preliminary injunction.  Moreover, the Smith Parties will suffer no burden in being so enjoined.

### A.    Balance of Harms.

Typically, the balancing of the harms analysis relating to a preliminary injunction is the final step undertaken by the Court.  Here, because the parties' representations and actions bear significantly on our consideration, we shall begin our discussion with these issues.  The Smith Parties have represented, apparently countless times, that they are no longer using the names "Home Instead" or "Home Again" in connection with their business.  [*See, e.g.,* Dkt. No. 86 at 15-16, 32-33; Dkt. No. 157.]  Home Again has morphed into "Purpose Home Health" at this point and represents that "it voluntarily stopped operating under [Home Again Senior Care] on April 1, 2015 . . . and has no intention of using the 'Home Again Senior Care' trade name in the future."  [Dkt. No. 86 at 19.]  The Smith Parties assert that "Elder Care and the Smiths stopped using Home Instead's Licensed Marks and any Home Instead materials as of early February 2015."  [Dkt. No. 86 at 17.]  Indeed, the Smith Parties have argued that "any effort by Home Instead to seek an injunction with regard to the Licensed Marks or 'confidential information' has been

rendered moot." [Dkt. No. 86 at 18 (citing *Chicago United Indus., Ltd. v. Chicago*, 445 F.3d 940, 947 (7th Cir. 2006)).][6]

However, based on the evidence supplied by Home Instead, its request for injunctive relief is not rendered moot by the Smith Parties' representations. The Smith Parties have conceded that in isolated circumstances anecdotal references to Home Instead would crop up in the conduct of Elder Care's business; they characterize those references as "what one would expect after the initial breakup" in a divorce. [Dkt. No. 86 at 19.] Home Instead disagrees. The Smith Parties represent that as of February 2015 they ceased using the name Home Instead. [*See* Dkt. No. 87-35 (Decl. of G. Smith at ¶ 3 ("On February 4, 2015. Elder Care ceased operating as a franchisee of Home Instead, Inc., and ceased using the trade names 'Home Instead Senior Care' and 'Home Instead.'"); *id.* at ¶ 8 ("To my knowledge, we have taken every reasonable step to ensure that we are no longer operating under the trade names 'Home Instead Senior Care' or 'Home Instead'.").] Yet, in a March 16, 2015 email sent by Mrs. Smith to the Indiana State Department of Health, she referred to Elder

---

[6] Although the Smith Parties cite to *Chicago United*, that case supports the entry of an injunction under these circumstances given that, as recently as July, 2015, the Smith Parties received a check in payment for services addressed to "Home Instead Care" [Dkt. No. 160-11]. In addition, they described in their communications with the public Purpose Home Heath as "formerly Home Again Senior Care." [Dkt. No. 155-2 at p. 36.] They also transferred client lists, files, and records to Care Choices in July, 2015. [Dkt. No. 154 at 4-7.] The court in *Chicago United* held: "It is true that the mere cessation of the conduct sought to be enjoined does not moot a suit to enjoin the conduct, lest dismissal of the suit leave the defendant free to resume the conduct the next day. But that is in general rather than in every case. 'The case may nevertheless be moot if the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated.'" *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 947 (7th Cir. 2006) (citations omitted). Based on the evidence before us, the Smith Parties' representations do not entirely moot Home Instead's request.

Care as "formerly Home Instead Senior Care." [Dkt. No. 100-19.] The next day, the Department of Health informed Mrs. Smith that it did not recognize Elder Care's name and instructed her that "[w]hen submitting documentation to our office it must be submitted as Home Instead Senior Care." [*Id.*] On March 17, 2015, Mrs. Smith used the name "Home Instead Senior Care" in her signature block on an email to the Department of Health. [Dkt. No. 100-20.] On March 19, 2015, Kimberly Dean, the Home Again Scheduling Coordinator, used the name "Home Again/Home Instead Senior Care" as her company affiliation in her email signature block. [Dkt. No. 101-4.] As of July 31, 2015, Elder Care's bank account with The National Bank of Indianapolis was still named "Elder Care Providers of Indiana DBA Home Instead Senior Care." [Dkt. No. 155-2 at p. 47.]

The same pattern is true for the name "Home Again." On May 18, 2015, Mr. Smith stated in his declaration: "We have no plans, however, to use the name 'Home Again Senior Care' ever again with our patients, employees, vendors, or in any other capacity. We are not using the Home Again Senior Care name, or any derivation thereof, even to describe our former business." [A. Smith Decl. at ¶ 18.] But, one month later, on June 17, 2015, Mr. Smith sent an email in which his signature block read: "Purpose Home Health *formerly Home Again Senior Care*." [Dkt. No. 155-2 at p. 36.] And one month after that, on July 15, 2015, Monica Watson-Clark, Purpose's Intake Manager, sent an email to Mrs. Smith wherein her signature block stated: "Purpose Home Health (formerly Home Again Senior Care)". [Dkt. No. 155-2 at p. 40.]

The Smith Parties have stated that they "have no interest in any continued affiliation with Home Instead or its information." [Dkt. No. 86 at 18 (citing A. Smith Decl. at ¶ 12).]

12

They "have gone to great lengths to eradicate any connection to Home Instead, sending back any information in their possession that originated with Home Instead, . . . ." [Dkt. No. 86 at 17.] The Smith Parties contend that Home Instead's efforts to seek an injunction with regard to this "confidential information" have been rendered moot by its actions to return all such documents. If true, no burden will befall the Smith Parties from the entry of a preliminary injunction that requires them to do that which they have already done.

### B. Reasonable Likelihood of Success on the Merits.

Home Instead has also demonstrated a reasonable likelihood of success on the merits with respect to its trademark infringement claims and the breach of the Franchise Agreement claim related to the return of confidential information. "A reasonable likelihood of success on the merits means a better than negligible chance of succeeding on the merits." *Boczar v. Kingen*, No. IP 99-0141-C-T/G, 1999 WL 33109074, at *5 (S.D. Ind. July 2, 1999) (citing *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1114 (7th Cir.1997); *Doyle,* 162 F.3d at 473 (Manion, J., dissenting) ("more than a negligible chance of success on the merits")).

Most of Home Instead's claims are predicated on a finding that it rightfully terminated the Franchise Agreement. This central issue remains hotly contested by the parties. Home Instead posits that it had the right to immediately terminate the Franchise Agreement after its twenty-month investigation revealed that the Smiths were using the name "Home Again Senior Care" for their medical care-based company. In response, the Smiths contend that Home Instead waived its right to terminate the Franchise Agreement due to its delay in doing so and that once it decided to terminate the agreement, it did so

improperly without notice and in bad faith, in violation of the Ind. Code § 23-2-2.7.[7]  The Smiths also contend that the post-termination covenants in the Franchise Agreement are overbroad and unenforceable as a matter of law.  Although this issue remains hotly disputed between the parties, Home Instead can at a minimum show a better than negligible chance of succeeding on its claimed breach of Franchise Agreement that permitted its lawful termination by Home Instead.

The Franchise Agreement provides in part:

**B.   LIMITATIONS ON FRANCHISEE'S USE OF LICENSED MARKS**

Franchisee agrees to use the Licensed Marks as the sole identification of the Franchised Business, provided that Franchisee identifies himself/herself as the independent owner in the manner prescribed by Franchisor. Franchisee must not use any Licensed Mark as part of any corporate or trade name or with any prefix, suffix or other modifying words, terms, designs or symbols, or in any modified form, nor may Franchisee use any Licensed Mark in the sale of any unauthorized product or service or in any other manner not expressly authorized in writing by Franchisor. Franchisee agrees to display the Licensed Marks prominently and in the manner prescribed by Franchisor on signs and forms. Further, Franchisee agrees to give notices of trademark and service mark registrations and copyrights Franchisor specifies and to obtain fictitious or assumed name registrations as may be required under applicable law.

[Franchise Agreement at ¶ 6(B).]  The evidence submitted to us in conjunction with the pending motion demonstrates that (1) the Smith Parties had continued to use the name "Home Instead" after termination of the Franchise Agreement and (2) without Home

---

[7] The Smith Parties have argued that Home Instead's termination of the Franchise Agreement was coercive because Home Instead offered to suspend the termination only if the Smiths would agree to pay royalties for Home Again's profits and wind down both companies – which is describes as "Don Corleon's irrefutable offer."  [Dkt. No. 86 at 20.]  Home Instead, on the other hand, contends that its attempts were made in good faith and in an attempt to reach a compromise.  [Dkt. No. 89 at 5-7.]  The weight of the evidence before us suggests that Home Instead's termination of the Franchise Agreement was not made in bad faith and was based on its interpretation of the Franchise Agreement.  Home Instead has demonstrated the requisite "better than negligible" likelihood of success in proving that its termination of the Franchise Agreement was lawful.

Instead's permission, the Smith Parties had used the name "Home Instead" in conjunction with their other company, "Home Again," in an attempt to market the two companies together, and that the Smith Parties often intertwined details of the operations of the two businesses. This evidence contradicts the Smith Parties' position that Home Instead terminated the Franchise Agreement in bad faith.

Home Instead argues that the Smith Parties used its formerly-authorized mark following the termination of the Franchise Agreement, which constitutes the use of counterfeit marks. *Century 21 Real Estate, LLC v. Destiny Real Estate Properties*, 2011 WL 6736060, at *3 (N.D. Ind. Dec. 19, 2011) ("The Court therefore holds that [the former franchisee's] continued unlicensed use of [the franchisor's] trademarks in reference to services that have no connection with, nor approval from, [the franchisor], constitutes the use of counterfeit marks."). Examples of such use were submitted during the hearing – emails from March of 2015 referencing Home Instead and a copy of Elder Care's bank account, which states "DBA HOME INSTEAD SENIOR CARE." [*See* Home Instead PowerPoint Presentation.] The Smith Parties did not dispute these uses of the name Home Instead or that they occurred after Home Instead had terminated the Franchise Agreement.

Home Instead also contends that the name "Home Again" is a modified form of the "Home Instead" trademark, which infringes on Home Instead's trademark and the use of such a modified trademark violates the Franchise Agreement and trademark law. For example, Mr. Smith explained to a Home Instead representative that "he chose the name Home Again Senior Care because he wanted a name as close as possible to Home Instead Senior Care, that way he could market the two businesses together and use Home Instead,

15

Inc.'s reputation to build the Home Again Business." [Dkt. No. 60 at 28 (citing Declaration of Jennifer Rozgay at ¶¶ 6-7); *see generally id.* at 11-12 (examples of considering the two companies as one business).] Home Again's workers compensation policy listed contact information for Mr. Smith at his "homeinstead.com" email address. [*Id.* at 11.] The Smiths advertised a job opening for Home Again under the name Home Instead. [*Id.*] Thus, we hold that Home Instead has a better than negligible chance of succeeding on this claim for breach of the Franchise Agreement, the consequences of which breach permits the termination of the Franchise Agreement and the cessation of the Smith Parties' entitlement to the continued use the Home Instead mark or derivations thereof.

Likewise, Home Instead has demonstrated a likelihood of success on its trademark claims pursuant to which it asserts that the Smith Parties' use of the names "Home Instead" and "Home Again" will and do cause confusion between the marks and the parties. "In the trademark/service mark/unfair competition field, the movant shows a likelihood of success by establishing that: 1) [it] has a protectable mark, and 2) that a 'likelihood of confusion' exists between the marks or products of the parties." *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1114-15 (7th Cir. 1997) (citations omitted). No dispute exists over the fact that Home Instead has protectable trademarks. In addition, Home Instead has presented sufficient evidence of actual confusion arising when the Smith Parties used both the Home Instead and the Home Again trademarks. [*See, e.g.* Dkt. No. 60 at 3 (describing a phone call to a neighboring Home Instead franchisee for an employee at Home Again).] Thus, we also conclude that Home Instead has demonstrated a better

than negligible chance of succeeding on the merits of its trademark claim, which forecloses the Smith Parties' right to use the "Home Again" moniker.

### C.  Lacks Adequate Remedy at Law and Irreparable Harm.

There is a "well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss." *Abbott Labs.,* 971 F.2d at 16; s*ee also AM Gen. Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 805 (7th Cir. 2002) (confirming "the law's presumption that trademark dilution or infringement threatens irreparable injury for which there is no adequate remedy at law"); *Deckers Outdoor Corp. v. Does 1-100*, No. 12 C 10006, 2013 WL 169998, at *4 (N.D. Ill. Jan. 16, 2013). "This willingness to find irreparable harm in trademark cases stems from an understanding that the 'most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods.  Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another.'" *7–Eleven, Inc. v. Spear,* No. 10 C 6697, 2011 WL 830069, at *6 (N .D. Ill. Mar. 3, 2011) (quoting *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 (7th Cir. 1988)).

Home Instead has submitted undisputed evidence of the strength of its marks.  Home Instead has more than 1000 independently owned and operated franchises worldwide, with over 600 located in North America.  [Dkt. No. 60 at 26 (citing Dkt. No. 22 at ¶ 8).] According to the Director and General Counsel for Home Instead, Tanya Morrison, the company has expended significant amounts of time, effort, and resources to perfect its unique management and business system. [Morrison Decl. at ¶¶ 4-14.]  Home Instead

claims that it keeps its system and confidential information secret from competitors and works to ensure that the system and information do not become publically known.  [*Id*. at ¶¶ 11-14.]  It registers the Licensed Marks in order to protect the brand equity it has built over the course of the past twenty years, and to allow potential consumers to differentiate between start-up companies that offer home care services to seniors and the global leader. [*Id*., Ex. 1-5.]  All of Home Instead, Inc.'s efforts have allowed it to become the largest franchisor in the field of home care services for seniors, routinely earning top honors for franchising excellence.  [Dkt. No. 61 at 27 (citing Hogan Decl. at ¶ 3).]

The strength of Home Instead, Inc.'s Licensed Marks is reflected in the public's awareness of the Licensed Marks.  For example, Home Instead, Inc.'s marketing research reveals that between February 2013 and June 2014, its website was visited more often than its top three competitors combined, and that in 2014, approximately 600,630 searches were performed on Google by people throughout the United States using the key words "Home Instead Senior Care" or a variation thereof.  [Dkt. No. 60 at 27 (citing Declaration of Doug McCall, ¶¶ 4-5, Ex.1-2).]  Of those searches, approximately 8,740 were conducted by people in the Indianapolis, Indiana area.  [*Id*., Ex. 2.]  We find that the Smith Parties' unauthorized use of the Home Instead trademarks, including similarity of the Home Again name, threaten to irreparably harm the reputation and goodwill Home Instead has developed with respect to its home care services.  Having so determined, we also find that Home Instead will suffer irreparable harm without a preliminary injunction, and that there is no adequate remedy at law for this harm.

II.     **Enforcement of Post-Termination Covenants Against the Smiths Related to Operation of Home Again (n/k/a Purpose).**

Home Instead seeks to enforce the Franchise Agreement's post-termination covenants which prohibit the Smiths from operating or having any financial or beneficial interest in a non-medical and domestic care service business in Elder Care's former exclusive territory that is of a character and concept similar to a Home Instead Senior Care. According to Home Instead, Home Again (now known as Purpose) is "of a character and concept similar to" Home Instead and, as a result, asks us to enjoin the Smiths from operating Home Again/Purpose.  Home Instead's ability to establish irreparable harm is thwarted by its inability to establish a likelihood of success on the merits and its failure to make reasonable or at least tolerable the burden on Home Again/Purpose's clients and employees of injunctive relief that would put the Smiths entirely out of business.[8]

A.      **Irreparable Harm and Inadequacy of Legal Remedies.**

Twenty months after learning that the Smiths had founded an HHA to deliver medically-related home health services called "Home Again," Home Instead terminated the Franchise Agreement between them.  Home Instead then waited three months after the

---

[8] Home Instead also complained that Elder Care's sale of the client list and transfer of patients to Care Choices on an installment basis results in Elder Care having a financial interest in a "non-medical companionship and domestic care services business that is of a character and concept similar to the HOME INSTEAD SENIOR CARE Business" in contravention of paragraph 18(C)(2) of the Franchise Agreement.  [Dkt. No. 142 at 12.]  Home Instead has made no specific request for relief with respect to Elder Care's installment-based sale to Care Choices (other than that "the Court is equally empowered to order the Smith Parties to divest themselves of the unlawful interest in Care Choices" [Dkt. No. 142 at 15]) and has stated it does not seek to unwind the Transfer Agreement.  Because Home Instead has made no specific request for injunctive relief with respect to the Transfer Agreement and Elder Care's sale of its client list and transfer of patients to Care Choices, we decline to consider or grant any such relief at this time.

19

filing of this lawsuit to seek a preliminary injunction in an attempt to stop Home Again/Purpose from operating in Elder Care's former Home Instead territory. Even then, Home Instead did not seek in its original motion specifically to enjoin the Smith Parties from operating Home Again/Purpose in its original motion. [*See* Dkt. No. 60 (Home Again's Mtn. for Prelim. Inj.).] Not until August 21, 2015 in its Supplemental Reply Brief did Home Instead requested that Home Again/Purpose's operations cease within Elder Care's former exclusive area, a request it buried on page 15 of that brief. [Dkt. No. 154 at 15; *see also* Dkt. No. 142 (Home Instead's Supp. Br. filed July 28, 2015) ("The Smiths are also continuing to operate Home Again in the former Exclusive area in violation of Section 17 of the Franchise Agreement, . . .").]

"[A] delay in requesting equitable relief is inconsistent with a claim of irreparable injury." *Taylor v. Biglari*, 971 F. Supp. 2d 847, 853 (S.D. Ind. 2013) (citing cases where a two-month delay and a six-month delay repudiated a claim of irreparable injury). We similarly view Home Instead's delay as inconsistent with its claim of irreparable injury. Indeed, Home Instead's actions speak louder than its words. If Home Again/Purpose's operations were truly causing irreparable injury, then we would have expected Home Instead to act more promptly in seeking judicial relief. Instead, Home Instead waited nearly two years to seek to halt the Home Again/Purpose business invoking a two-year covenant not to compete. The time period of potential competitive harm defined by Home Instead passed under its own blind eye. Home Instead has failed to make an adequate showing of irreparable harm or inadequate remedy at law with respect to its request that Home Again/Purpose be enjoined from continuing to operate its HHA.

20

**B.      Reasonable Likelihood of Success on the Merits.**

In addition to the lack of irreparable harm and an inadequate remedy at law, Home

Instead has failed to demonstrate a reasonable likelihood of success on the merits that

Home Again/Purpose is a "non-medical companionship and domestic care service business

that is of a character and concept similar to the HOME INSTEAD SENIOR CARE

Business", as described in paragraph 17(C)(2) of the Franchise Agreement.[9]  Home Instead,

by its own admissions, operates as a non-medical home care company (PSA) as opposed

to a medical home care company (HHA).  [John Hogan (Chief Development Officer for

Home Instead) Deposition at 34; *see also* Dkt. No. 86 at 4 (quoting Home Instead materials

repeating that its services are "exclusively non-medical").]  PSAs, like the Indianapolis-

located Home Instead franchisees, cannot lawfully provide the medical services provided

by an HHA because they are not licensed to do so.  According to the Smith Parties, Elder

Care's Franchise Agreement expressly prohibited Elder Care from providing medical

services.  [Dkt. No. 86 at 6.]

Home Again/Purpose operates as a home health agency (HHA) pursuant to HHA

licensure and provides care based on a prescription from a medical doctor that is overseen

by a licensed registered nurse.  [*Id.* ("An HHA license is necessary to perform skilled

---

[9] The Smith Parties have advanced several arguments that the post-termination covenants
of the Franchise Agreement are overly broad and unenforceable, including but not limited to the
scope of the non-competition provision and the defined geographic scope.  [*See* Dkt. No. 86 at 23-
32.]   We need not resolve these issues today because, even assuming the post-termination
solicitation and competition covenants *are* enforceable, Home Instead has failed to demonstrate
that Home Again/Purpose is of the same character and concept as Home Instead such that its
operation could be construed as competitive.

nursing services in the home, such as dressing, cleaning, and debriding wounds, drawing blood, injecting prescribed medications, providing medical baths, and providing periodic nursing assessments and diagnoses. All services provided to the patient under a doctor's plan of care, including meal preparation and light housekeeping, are considered medical because they are administered according to the physician's orders and at the direction of a registered nurse.") (citing Declaration of Vivian Ann "Rusty" Diemer (owner of First Horizon Consulting, Inc. which provided guidance to the Smiths in starting Home Again/Purpose) at ¶¶ 7-8; A. Smith Dep. at 21-22, 27; A. Smith Decl. at ¶ 3).] The gravamen of an HHA, like Home Again/Purpose, is to provide medical-based home health care. In contrast, the Franchise Agreement's covenant not to compete prohibits the Smiths from operating a "non-medical companionship and domestic care service business" – which Home Again/Purpose clearly is not.

Home Instead argues that the services provided by Home Again/Purpose overlap with those provided by Home Again/Purpose. Home Instead takes the position that because some of the services provided by Home Again/Purpose are the same as those provided by Home Instead (such as bathing a patient, for example), Home Again/Purpose is of a character and concept similar to Home Instead. But Home Instead ignores the fact that the covenant not to compete is limited to competing non-medical companionship and domestic care company of a character and concept similar to Home Instead. No evidence supports a finding that Home Again/Purpose is a non-medical companionship and domestic care company similar to Home Instead. Given the significant burden to Home Again/Purpose, its patients, and its employees described below, Home Instead's very

22

modest likelihood of success (if any) cannot overcome the burden that would result from this form of injunctive relief.

### C.   Balance of the Equities.

The balance of the equities here also weighs strongly *against* enjoining the Smiths from operating Home Again/Purpose.  Home Again/Purpose has 230 patients with 124 employees.   All 230 patients could be deprived of a continuity of care if Home Again/Purpose were forbidden from operating in the Elder Care former exclusive area.  In addition, Home Again/Purpose's 124 employees may be out of work, if Home Again/Purpose were not allowed to operate in Elder Care's former exclusive area.  Home Again/Purpose would be forced to close up shop and seek to relocate in an unfamiliar territory, if it were enjoined as Home Instead asks.  As we have previously noted, the potential burden on Home Again/Purpose, its patients, and employees is potentially tremendous.  Home Instead's failure to establish that a significant likelihood of success, does not offset the significant burden imposed on the Smith Parties, Home Again/Purpose's patients, and Home Again/Purpose's employees if an injunction were to be entered.

## III.   Conclusion.

Home Instead's Motion for Preliminary Injunction is GRANTED in PART and DENIED in PART.  Home Instead's request for a preliminary injunction to halt the business of Home Again/Purpose is DENIED.  We GRANT, however, Home Instead's request for preliminary injunctive relief ordering the Smith Parties to cease using the names Home Again, Home Again Senior Care, Home Instead, and Home Instead Senior Care and

deliver all business-related materials pertaining related to the operation of the Elder Care, Inc. Home Instead franchise as follows:

(1)      Anthony Smith, Georgette Smith, and Home Again Senior Care, Inc. (n/k/a Purpose Home Health, Inc.) shall immediately cease using the names Home Instead® and Home Instead Senior Care® with respect to any of their businesses, including but not limited to, any non-medical home care and medical home health care; and

(2)      Anthony Smith, Georgette Smith, and Home Again Senior Care, Inc. (n/k/a Purpose Home Health, Inc.) shall immediately cease using the names Home Again and Home Again Senior Care with respect to any of their businesses, including but not limited to, any non-medical home care and medical home health care, which includes describing Purpose Home Health Care, Inc. as "formerly Home Again" or "formerly Home Again Senior Care"; and

(3)      Anthony Smith, Georgette Smith, and Home Again Senior Care, Inc. (n/k/a Purpose Home Health, Inc.) shall deliver to Home Instead, Inc. all Operations Manuals, software licensed by Home Instead, records, files, instructions, correspondence, all materials related to operating Elder Care, Inc., including, without limitation, agreements, invoices, and any and all materials relating to the operation of the Elder Care, Inc. in the Smith Parties' possession or control within the next fifteen (15) days.

Date:    09/14/2015   

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

24

Distribution:

Gregory W. Guevara
BOSE MCKINNEY & EVANS, LLP
gguevara@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP
pzimmerly@boselaw.com

Ronald E. Elberger
BOSE MCKINNEY & EVANS, LLP
relberger@boselaw.com

Adam W. Barney
CLINE WILLIAMS WRIGHT JOHNSON & OLDFATHER, LLP
abarney@clinewilliams.com

Theresa D. Koller
CLINE WILLIAMS WRIGHT JOHNSON & OLDFATHER, LLP
tkoller@clinewilliams.com

Trenten P. Bausch
CLINE WILLIAMS WRIGHT JOHNSON & OLDFATHER, LLP
tbausch@clinewilliams.com

Adam  Arceneaux
ICE MILLER LLP
adam.arceneaux@icemiller.com

Mark R. Alson
ICE MILLER LLP
mark.alson@icemiller.com

Olga A. Voinarevich
ICE MILLER LLP
olga.voinarevich@icemiller.com

Josh F. Brown
LAW OFFICES OF JOSH F. BROWN, LLC
josh@indyfranchiselaw.com