UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ELDER CARE PROVIDERS OF INDIANA, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 1:14-cv-01894-SEB-MJD |
| vs. | ) ) | |
| HOME INSTEAD, INC., | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |
| HOME INSTEAD, INC., | ) ) | |
| Counter Claimants, | ) ) | |
| vs. | ) ) | |
| ANTHONY SMITH, GEORGETTE SMITH, PURPOSE HOME HEALTH, INC. f/k/a Home Again Senior Care, Inc., ELDER CARE PROVIDERS OF INDIANA, INC., | ) ) ) ) | |
| Counter Defendants. | ) ) | |

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This matter is before us on cross motions for summary judgment filed by Elder Care

Providers of Indiana, Inc., Purpose Home Health, Inc., Anthony Smith, and Georgette

Smith [Dkt. No. 190] and Home Instead, Inc. [Dkt. No. 192].

## Facts[1]

This case centers on claims for breach of a franchise agreement.  Defendant Home Instead, Inc. ("Home Instead") operates a business that provides non-medical care to senior citizens through a network of more than 1,000 independently-owned franchises.  Home Instead's mission statement reflects its business focus, as follows:  "To be the world's trusted non-medical source of companionship and home care for seniors."  [Deposition of Tanya Morrison, Director and General Counsel for Home Instead ("Morrison Dep.") at 15.]  Typical Home Instead clients are senior citizens who wish to live independently in their own homes, but who are in need of home care services to enable them to do so.  According to Home Instead, "[t]he term 'home care' describes two very different types of care.  One, home health care provided by licensed medical professionals, for which you need a prescription and two[] non-medical home care[], such as personal care, homemaker or companionship services provided by professional caregivers."  [Deposition of John

---

[1] On September 14, 2015, we entered a Preliminary Injunction limiting Elder Care's use of the Home Instead name and requiring it to return certain documents and records to Home Instead. [Dkt. No. 165, as explained by Dkt. No. 198.]  Our recitation of facts in that Order has been largely imported here and supplemented where necessary based on the parties' summary judgment briefing.

From its proverbial glass house, and just before reciting 37 pages of facts, Home Instead criticizes the Smith Parties' statement of facts as containing statements "beyond those that are potentially determinative of the motion, argument, and unnecessary background facts . . . [and cause] an undue burden on Home Instead and the Court."  [Dkt. No. 207 at 12.]  We agree that *both* parties have unduly and unnecessarily burdened the court with their **356 pages** of briefing of which 74 pages are factual assertions and include frivolous objections such as to the use of the word "unexpected" to describe the Smith Parties' reaction to the termination of the Franchise Agreement and discovery-like objections for vagueness and ambiguity.  The parties are admonished to be more restrained and more disciplined in the future including by limiting their arguments to those that truly are at issue.

Hogan, Chief Development Officer for Home Instead ("Hogan Dep.") at 34 (quoting Dkt. No. 87-23 (Home Instead website)).]

**Elder Care**

Plaintiff Elder Care Providers of Indiana, Inc. ("Elder Care"), wholly owned by Anthony and Georgette Smith (the "Smiths"), was previously one of Home Instead's franchisees.  On October 16, 2006, Elder Care entered into a franchise agreement with Home Instead pursuant to which Elder Care agreed to operate the Home Instead business within an exclusive geographical area on the east side of Indianapolis, Indiana for a period of ten years ("Franchise Agreement") and was granted a limited license to use Home Instead's trademarks.  The Smiths personally guaranteed the Franchise Agreement.  [Dkt. No. 1-1 (Franchise Agreement).]  After opening their franchise in November 2006, the Smiths were successful in developing their business, becoming well respected by the other Indianapolis-area franchisees, and recognized by Home Instead for their success and growth.   [Deposition of Jeff Sewell, another Home Instead franchise owner ("Sewell Dep.") at 20; Deposition of Michael Bunnell, another Home Instead franchise owner ("Bunnell Dep.") at 61; Hogan Dep. at 60-62; Dkt. No. 207 at 27 (At the time of termination of the Franchise Agreement, Elder Care's revenue was in the top 25-50% of all Home Instead franchisees) (citing Barney Decl.).]

Elder Care and other Home Instead franchisees in Indiana are each licensed as a "Personal Services Agency" ("PSA") rather than as a "Home Health Agency" ("HHA"). To obtain a PSA license, a franchisee must complete an application, demonstrate that it does background checks and tuberculosis tests on employees, explain its ownership and

insurance structure, and make a $250 annual payment.  [Ind. Code § 16-27-4; Deposition of Chris Irons, Home Instead franchisee ("Irons Dep.") at 21-22; Deposition of Joseph Wrin, owner of Care Choices ("Wrin Dep.") at 15).]  A licensed PSA does not require medical staff, and oversight by the Indiana State Department of Health is more limited as compared to an HHA.  [Irons Dep. at 22; Wrin Dep. at 15; *see* Ind. Code § 16-27-4-6(e).]

In contrast, an HHA is regulated by Title 405 of the Indiana Administrative Code, when reimbursed by Medicaid, and oversight by the State is much more rigorous. [Declaration of Vivien Diemer, R.N., owner of First Horizon Consulting, Inc. ("Diemer Decl.") ¶ 6; Wrin Dep. at 15.]  Among other things, HHAs provide skilled nursing and home health aide services authorized by a physician's prescription or order from other medical professionals, and supervised by a registered nurse.  [*See* 410 IAC 17-12-2; Diemer Decl., ¶ 8; Deposition of Georgette Smith ("G. Smith Dep.") at 34-35.]  An HHA license is necessary to perform skilled nursing services in the home, such as wound care (dressing, cleaning, and debriding wounds), drawing blood, injecting prescribed medications, providing medical baths, and providing periodic nursing assessments and diagnoses.  [410 IAC 17-10-1(m); Diemer Decl., ¶ 7; Deposition of Anthony Smith ("A. Smith Dep.") at 21-22.]

The Smith Parties contend that all services provided to the patient under a doctor's plan of care, including meal preparation and light housekeeping, are considered medical because they are administered according to the physician's orders and at the direction of a registered nurse.  [Diemer Decl., ¶ 8; A. Smith Dep. at 21-24, 27-28; Declaration of Anthony Smith ("A. Smith Decl.") ¶ 3.]  Home Instead contends, however, that some

services prescribed by a physician can be considered non-medical and performed within the licensure of a PSA which would not violate its Franchise Agreements.

**Home Again/Purpose**

As a PSA, Elder Care provided non-medical home care to seniors. As opposed to an HHA, Elder Care was not allowed (both by its Franchise Agreement and Indiana licensure restrictions) to provide any medical care. Elder Care was required to refer its clients in need of medical care to HHAs to have their medical needs met, resulting in a disruption of the continuity of medical and non-medical care. [*See* G. Smith Dep. at 33.] In November 2011, Mr. and Mrs. Smith formed Home Again Senior Care, Inc., now known as Purpose Home Health, Inc. ("Home Again" or "Purpose"), a separately-licensed HHA corporation through which medical home health care is available to clients referred to it by both Elder Care and other area Home Instead franchises.[2] Purpose provides medical-based services; it is not licensed as a PSA. [Dimer Decl. ¶¶ 5, 7, 9; A. Smith Decl. ¶¶ 5, 6.]

Purpose and Elder Care regularly made referrals to one another. [*See* A. Smith Dep. at 73; Elder Care Dep. at 37-38.] In addition, Elder Care caregivers sometimes worked as Purpose home health aides, providing the greatest possible continuity of care. [A. Smith Dep. at 75.] Likewise, a number of administrative employees provided services for both

---

[2] The Smith Parties contend that they did not believe that Home Again/Purpose would compete with Home Instead (or Elder Care), in part because Home Instead encourages its franchisees to develop partnerships with HHAs to provide complementary services. [Dkt. No. 86 at 8 (quoting Home Instead's Operations Manual).] Moreover, the evidence demonstrates that all of the Home Instead franchisees with whom Home Again/Purpose have partnered testified that they could not provide the medical services provided by Home Again/Purpose because those franchisees can provide only non-medical services. [*Id.* at 9 (citing franchisee depositions); Dkt. No. 191 at 18.]

Elder Care and Purpose. [Elder Care Dep. at 5-6, 33-35, 68, 78-79.] Other Home Instead franchisees in central Indiana have also developed a referral relationship with Purpose because, as stated above, Home Instead franchisees cannot provide HHA medical services. [Morrison Dep. at 91-93; 11/3/15 Deposition of Tanya Morrison ("11/3/15 Morrison Dep.") at 78-79; *see also* Deposition of Andrea Holt, a former Elder Care employee ("Holt Dep.") at 46-47, 49, 77, 78-79.]

**Home Instead's Investigation of the Smiths, Elder Care, and Home Again**

Not until March 2013 did Home Instead first learn of Home Again's operations,[3] which gave rise to two concerns: (1) the possible confusion caused by the use of the name "Home Again";[4] and (2) the possibility that Home Again would provide services in direct competition with Home Instead.

The Franchise Agreement prohibits Elder Care and the Smiths from competing with Home Instead and making unauthorized use of any Home Instead licensed mark. With regard to prohibited competition, the Franchise Agreement provides as follows:

---

[3] Another Indianapolis-area franchisee, Mike Bunnell, contacted Home Instead and reported that the Smiths had started the Home Again/Purpose business. Mr. Bunnell raised concerns that Home Again's HHA license would allow it to provide care and "prior authorization hours" paid for by Medicare and Medicaid, at the expense of Home Instead businesses. An additional concern raised by Mr. Bunnell was the similarity between the "Home Again" name and the name "Home Instead" which could (and did) cause confusion. [*See* Dkt. No. 196-10 (Email from Mr. Bunnell to Susan Richardson at Home Instead).] Home Instead quickly investigated and discovered (within two days) that the Smiths were operating Home Again. That discovery prompted further investigation. [Morrison Dep. at 32-33.]

[4] The parties dispute the reason the Smiths named their HHA "Home Again." The Smiths claim that it was inspired by Jim Neighbors's "Back Home Again in Indiana" singing performances at the Indianapolis 500, while Home Instead points to testimony of Mr. Smith that he desired to have "Home Again" be similar to "Home Instead" so he could market the two companies together.

In consideration for this specialized training, Trade Secrets, Confidential Information and rights, Franchisee covenants that during the term of this Agreement and for a period of two (2) years following the expiration or termination of this Agreement, that neither Franchisee nor any of its officers, directors, managers or employees shall, either directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership, corporation or limited liability company:

(1)   divert, or attempt to divert, any business or customer of the Franchised Business to any competitor, by direct or indirect inducement or otherwise, or to perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Licensed Marks and the System;

(2)   own, maintain, operate, engage in, or have any financial or beneficial interest (including any interests in any corporations, partnerships, trusts, limited liability companies, incorporated associations or joint ventures) advise, assist, or make loans to, any non-medical companionship and domestic care service business that is of a character and concept similar to

the HOME INSTEAD SENIOR CARE Business. As used in this Agreement, the term "similar" means a business which looks like, copies, imitates or operates in a manner similar to a HOME INSTEAD SENIOR CARE Business, including, but not limited to, any non-medical service business, and which business is, or is intended to be, located at the location of the HOME INSTEAD SENIOR CARE Business. The term "non-medical companionship and domestic care service business" for purposes of this paragraph shall mean companionship and domestic care services which include, but are not limited to, companionship, light housekeeping, meal preparation, errands, incidental transportation, assistance in laundry and other activities for the benefit of the customer, reminders to take medication (both prescription and over-the-counter), assistance in grooming, bathing, personal hygiene, assistance with problems such as incontinence and other personal care services as defined by Franchisor throughout the term of this Agreement.

[Franchise Agreement at ¶ 17(C)(2) (marks in original exhibit tendered to the court).]

The Franchise Agreement's limitations on the use of Home Instead's licensed marks is as follows:

7

### B.   LIMITATIONS ON FRANCHISEE'S USE OF LICENSED MARKS

Franchisee agrees to use the Licensed Marks as the sole identification of the Franchised Business, provided that Franchisee identifies himself/herself as the independent owner in the manner prescribed by Franchisor. Franchisee must not use any Licensed Mark as part of any corporate or trade name or with any prefix, suffix or other modifying words, terms, designs or symbols, or in any modified form, nor may Franchisee use any Licensed Mark in the sale of any unauthorized product or service or in any other manner not expressly authorized in writing by Franchisor. Franchisee agrees to display the Licensed Marks prominently and in the manner prescribed by Franchisor on signs and forms. Further, Franchisee agrees to give notices of trademark and service mark registrations and copyrights Franchisor specifies and to obtain fictitious or assumed name registrations as may be required under applicable law.

[*Id.* at ¶ 6(B).]

After learning of Home Again's operations, Home Instead undertook what became a 20-month investigation into Home Again.  The parties do not dispute the facts of the timeline, explicated in great detail in their summary judgment briefing.  The *cause* for the length of time consumed by the investigation is disputed,[5] however, that dispute is immaterial to a resolution of the parties' motions for summary judgment.  The Smiths and Home Instead reportedly communicated many times during the investigatory process during which Home Instead requested, and the Smiths supplied, information and documentation related to Elder Care and Home Again/Purpose.  Home Instead repeatedly informed the Smiths that the Home Again name would need to be changed.  [Dkt. No. 191 at 20-26.]

On January 16, 2014, Susan Richardson (Home Instead Business Performance Manager) emailed Jisella Dolan (Home Instead's Chief Advocacy Officer), Jennifer

---

[5] Home Instead argues that the Smiths delayed in providing documents requested during the investigation.  [*See* Dkt. No. 60 at 5-6.]  The Smiths contend that Home Instead prioritized issues other than the Smith Parties' Home Again company and deny any dilatoriness on their part to Home Instead's requests for information.  [*See* Dkt. No. 86 at 12; Dkt. No. 191 at 20-26.]

8

Rozgay (Home Instead's Franchise Standards Director), and Ms. Morrison (Home Instead's General Counsel), asking: "Do we have an update for this situation? Anthony [Smith] is really wanting closure and honestly I don't blame him." [Dkt. No. 196-50 (Dep. Ex. 265 at HI-007283).] Ms. Rozgay responded: "We have not put any constraints on him at the [sic] point with regards to his Home Again business so he can continue to run his business as he has. As soon as we have a final position on his Home Again business we will provide an update to Anthony and your team." [*Id.* at HI-007282.]

On January 31, 2014, Ms. Morrison wrote to Courtney Campbell, counsel for the Smith Parties, to communicate Home Instead's "concerns with the overlap in services" between Elder Care and Home Again/Purpose and that "even if we can work out the concerns with the services, at the very least the 'Home Again' name is going to need to be changed." [Dkt. No. 23-1 (Dep. Ex. 77 at HI-008283).] She further wrote that "[w]e appreciate any additional information or insight that you or your clients may have to help us resolve our concerns." [*Id.*]

The Smiths contend that throughout Home Instead's investigation they were willing to change the name of their HHA (Home Again), although Home Instead rejoins that the Smiths' willingness was conditioned on Home Instead's stipulation that Home Again did not compete with Home Instead, a concession that Home Instead was unwilling to make. [*Id.*; *see* Email from Campbell to Morrison dated May 21, 2014).]

**Home Instead Termination of the Smiths' Franchise Agreement**

Home Instead ultimately concluded that the operation of Home Again constituted a breach of the Franchise Agreement's competitive restrictions as well as an infringement on

Home Instead's trademark and, thus, terminated the agreement between it and Elder Care.

On November 7, 2014, Home Instead sent the following Termination Notice to the Smiths:

The following material defaults in performance have occurred under the Franchise Agreement:

1. Guarantors, who are also Principals of Franchisee, own, maintain, and are operating a separate business called Home Again Senior Care Inc. in Indianapolis, Indiana, which provides Approved Services. By engaging in this unfair competition, Franchisee and

   Guarantors are in violation of the in-term non-competition and non-disclosure covenants contained in the Franchise Agreement. *See* Sections 7(B), 7(C), and 17(C) of the Franchise Agreement.

2. By diverting business or clients to Home Again Senior Care Inc., Franchisee and Guarantors are in violation of the in-term non-competition and non-disclosure covenants contained in the Franchise Agreement. *See* Sections 7(B), 7(C), and 17(C) of the Franchise Agreement.

3. By using the name Home Again Senior Care Inc., which is confusingly similar to and constitutes a modification of one or more of Home Instead's Licensed Marks, Guarantors are in violation of Sections 6(A), 6(B), and 8(C) of the Franchise Agreement.

The defaults listed above constitute material breaches of the Franchise Agreement giving rise to termination pursuant to the provisions of Section 16 of the Franchise Agreement. Specifically, the default listed above in paragraph 3 constitutes a material breach of the Franchise Agreement and grounds to terminate the Franchise Agreement, effective upon notice to Franchisee, without granting Franchisee an opportunity to cure the defaults, pursuant to Section 16(B) of the Franchise Agreement, which states:

Franchisee is deemed to be in material default of this Franchise Agreement and [Home Instead] may, at its option, terminate this Agreement and all rights granted without granting Franchisee any opportunity to cure the default, effective immediately upon notice to Franchisee, upon the occurrence of any of the following events:

....

(7) If Franchisee makes any unauthorized use of the Licensed Marks[.]

Further, the material defaults set forth in paragraphs 1 and 2 above constitute good cause to terminate the Franchise Agreement by providing Franchisee with thirty (30) days written notice of the termination, with an opportunity to cure. However, because the defaults listed in paragraphs 1 and 2 are by their nature incurable and because Guarantors have engaged in the

activity described in paragraph 3, the Franchise Agreement is subject to immediate termination effective upon notice to Franchisee.

The Franchise Agreement provides that notice is deemed given "three (3) business days after placed in the United States Mail by Registered or Certified mail, Return Receipt Requested, postage prepaid." **Therefore, please note that the Franchise Agreement and all Franchisee's rights under the Franchise Agreement shall terminate, without further notice, effective three (3) days from the date of this Notice, for the material breaches of the Franchise Agreement described above.**

Upon termination of the Franchise Agreement, all post-termination provisions of the Franchise Agreement that survive termination shall remain in full force and effect. Please feel free to contact me with any questions. Thank you for your time and attention to this matter.

[Dkt. No. 1-3 ("Notice of Termination") (emphasis in original).]   At the time the Termination Notice was sent to the Smiths, Home Instead's General Counsel notified the Smiths' attorney that Home Instead would delay enforcement of its termination if the Smith Parties agreed that (1) Home Again would pay royalties to Home Instead for revenues generated since 2011; (2) Home Again would be consolidated with Elder Care to become a Home Instead franchise; and (3) the Smiths would amend their franchise agreement to transform their business into a medical franchise, and then have 180 days to sell their businesses or face permanent wind-down.  The Smiths did not agree to these terms and the franchise was thus terminated.

Elder Care continued to operate as a Home Instead franchise until January 31, 2015, which allowed time for Elder Care to wind down its business.  According to Elder Care, it stopped operating as a Home Instead franchise and ceased using any of Home Instead's trademarks during the first week of February 2015.

On May 26, 2015, counsel for the Smith Parties informed Home Instead that Elder Care had executed a Letter of Intent to undertake a complete transfer of Elder Care's clients to a neighboring Home Instead franchisee, Care Choices.  The Transfer Agreement, executed on July 15, 2015, transferred Elder Care's patients to Care Choices for $500,000 ($30,000 down payment within 3 months and 36 monthly payments thereafter).[6]  Home Instead raised various concerns about the legality of the Transfer Agreement in its briefing; however, Home Instead has to our knowledge never sought to unwind the Transfer Agreement.  [*See* Dkt. No. 154 at 3 ("Home Instead, Inc. is not asking the Court to unwind the Transfer Agreement at this point in time.").]  After transferring its clients to Care Choices, Elder Care ceased all business operations.

On January 2, 2015, the Smiths filed a request for trademark registration of "Purpose Home Health" with the United States Patent and Trademark Office.  Home Again's tradename was changed to Purpose Home Health on April 1, 2015.  As of August 26, 2015 Home Again Senior Care Inc.'s legal business entity name became Purpose Home Health, Inc.  [Dkt. No. 157-1.]

---

[6] It is Home Instead's view that the Smith Parties are not entitled to any consideration for the transfer of clients to Care Choices.  [Dkt. No. 142 at 3 (quoting Attorney Morrison Dep. (Dkt. No. 87-4 at 37, 262-63)).]

Alleging that Home Instead's termination constituted a breach of the Franchise Agreement and violated the Indiana Deceptive Franchise Practices Act, Elder Care filed the current lawsuit on November 8, 2014. On January 15, 2015, Home Instead filed a counterclaim against Elder Care, Mr. and Mrs. Smith, and Home Again (collectively referred to as the "Smith Parties") for breach of contract, civil conspiracy, misappropriation of trade secrets, unfair competition, and trademark infringement. Home Instead requested a preliminary injunction on February 17, 2015 and an evidentiary hearing was held on September 10, 2015. We granted in part the Motion for Preliminary Injunction in an order issued on September 14, 2015, which was subsequently clarified on December 10, 2015. The parties then filed their Motions for Partial Summary Judgment on November 25, 2015.

## Standard of Review

Summary judgment is appropriate when the record before the Court establishes that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the Court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *Id.* at 255. When, as in this case, the parties have filed cross-motions for summary judgment, "'we construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made.'" *Cavin v. Home Loan Center, Inc.*,

13

531 F.3d 526, 528-29 (7th Cir. 2008) (quoting *Premcor USA v. Am. Home Assurance Co.*, 400 F.3d 523, 526 (7th Cir. 2005)).  However, neither the "mere existence of some alleged factual dispute between the parties," nor the existence of "some metaphysical doubt as to the material facts," will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000) (internal citations omitted).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325; *Doe v. R.R. Donnelley & Sons, Co.,* 42 F.3d 439, 443 (7th Cir. 1994).  Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994).  But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *Celotex,* 477 U.S. at 322*; Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003).

Courts are often confronted with cross-motions for summary judgment, as is the case here, because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief.  "'In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary

judgment standard.'" *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 902 (S.D. Ind. 2009) (quoting *Kohl v. Ass'n. of Trial Lawyers of Am.*, 183 F.R.D. 475 (D.Md.1998)). "When evaluating each side's motion the court simply 'construe[s] all inferences in favor of the party against whom the motion under consideration is made.'" *Morgan v. Fennimore*, Cause No. 1:09-cv-399-SEB-TAB, 2010 WL 5057418, at *1 (S.D. Ind. Dec. 3, 2010) (quoting *Metro. Life Ins. Co. v. Johnson,* 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks–Robinson v. Excel Corp.,* 154 F.3d 685, 692 (7th Cir.1998))).

## Analysis

The parties' claims against each other stem largely from Home Instead's termination of the Franchise Agreement with Elder Care and the Smiths. According to the Notice of Termination, the Smith Parties materially breached the Franchise Agreement in three ways: (1) the Smiths engaged in unfair competition through their ownership and operation of Home Again, which violated the non-competition and non-disclosure covenants contained in §§ 7(B), 7(C), and 17(C) of the Franchise Agreement; (2) the Smith Parties diverted business/clients from Home Instead and Elder Care to Home Again, violating the same non-competition and non-disclosure covenants; and (3) the Smith Parties' use of the name "Home Again Senior Care Inc.", which was confusingly similar to and constituted a modification of Home Instead's trademark, violated §§ 6(A), 6(B), and 8(C) of the Franchise Agreement.

In response to the Termination Notice, the Smiths filed a four-count Complaint (subsequently twice amended; the operative complaint is now the Second Amended Complaint ("SAC")). The Smiths seek a declaratory judgment as follows: that Home

Instead did not provide proper notice of termination as required by the Franchise Agreement, that Elder Care is not in violation of the non-competition and non-disclosure covenants, and that Home Instead's termination of the Franchise agreement is of no legal effect.  [SAC ¶ 53.]  The Smith Parties also seek a declaration that their Transfer Agreement with Care Choices is valid and enforceable and the transfer of its clients from Elder Care to Care Choices does not constitute a misappropriation of trade secrets and does not otherwise violate the law.  [*Id.* ¶ 87.]  The Smith Parties allege that Home Instead's termination of the Franchise Agreement was a breach of contract [Count II] and that Home Instead violated the Indiana Deceptive Franchise Practices Act by terminating the Franchise Agreement in bad faith [Count III].

Home Instead filed an eight-count counterclaim in response to the Smiths' Complaint, alleging that the Smiths/Elder Care breached the Franchise Agreement (for the reasons stated in the Notice of Termination, as well as post-termination violations) [Counts II, VII], that the Smiths/Elder Care breached the covenant of good faith and fair dealing [Count III], and that the Smith Parties engaged in a civil conspiracy [Count IV], misappropriated trade secrets [Count V], and engaged in unfair competition [Count VI].

## I.   Claims Based on the Franchise Agreement

### A.   Home Instead's Termination of the Franchise Agreement

The parties disagree as to whether Home Instead properly terminated the Franchise Agreement, focusing on Home Instead's termination of the agreement without providing notice and an opportunity cure the alleged defaults.  [SAC, Counts I and II; Counterclaims, Counts I (Elder Care) and I (Smiths).]  Home Instead defends its termination of the

agreement based on the Smiths' unfair competition and trademark infringement (through their business, Home Again), which justified immediate termination without an opportunity to cure.  [Notice of Termination at 2.]

The Smith Parties cite two reasons for why Home Instead's termination was improper.  First, they argue, because Home Instead knowingly acquiesced to the Smith Parties' use of the name "Home Again" for twenty months, it waived its right to immediate termination of the Franchise Agreement.  Second, the Smith Parties contend that Home Again/Purpose does not compete with Home Instead, and, as a result, they did not violate the competition prohibition in the Franchise Agreement.

### 1.    The Smith Parties' Use of the Name "Home Again"

Home Instead asserts that it properly terminated the Franchise Agreement because the Smiths used the names "Home Again Senior Care" and "Home Again", which were confusingly similar modifications of Home Instead's marks, and also used Home Instead's licensed trademarks in an unauthorized manner, both of which violations of the terms of the Franchise Agreement warrant its termination.  The Smith Parties rejoin that Home Again was not a competitor of Home Instead, and in any event Home Instead waived its right to terminate the Franchise Agreement without notice.

For purposes of the Smith Parties' wavier argument, there is no dispute between the parties that the Smiths breached the Franchise Agreement by using the name "Home Again" in conjunction with its HHA, because that name is only a slight modification of Home Instead's trademarks and is confusingly similar.  Home Instead terminated the Franchise Agreement in part on the grounds that the Smith Parties made unauthorized use

17

of its trademarks, resulting in a material breach for which termination upon notice without an opportunity to cure was permissible.  [Notice of Termination; Morrison Dep. at 155-56.]  The Smith Parties contend that because Home Instead acquiesced over a twenty month period, while accepting royalty payments from Elder Care, knowing that the Smiths were operating an HHA called "Home Again," Home Instead waived its right to terminate the Franchise Agreement without notice or an opportunity to cure.[7]

"Waiver is an intentional relinquishment of a known right, requiring both knowledge of the existence of the right and intention to relinquish it." *Pohle v. Cheatham*, 724 N.E.2d 655, 659 (Ind. Ct. App. 2000) (citing *Matter of S.L.,* 599 N.E.2d 227, 229 (Ind. Ct. App. 1992)).[8]  "Moreover, waiver may be shown either by express or implied consent, and, thus, the right may be lost by a course of conduct which estops its assertion." *Id.* (citing *Continental Optical Co. v. Reed,* 86 N.E.2d 306, 309 (Ind. 1949)).  "However,

---

[7] The Franchise Agreement contains a provision that no delay or waiver on the part of Home Instead to exercise its rights under the Franchise Agreement constitutes a waiver by Home Instead "to enforce any right, option, duty or power against [Elder Care]."  [Franchise Agreement § 19(B).]  However, courts in both Indiana and Nebraska have rejected a party's efforts to rely on a nonwaiver clause where the party otherwise deviates from strict performance.  *See Pearce v. ELIC Corp.*, 329 N.W.2d 74, 79 (Neb. 1982) ("Even a provision in a written contract that a waiver of the conditions and terms of the agreement must be in writing may be waived by acts or conduct."); *Pierce v. Yochum*, 330 N.E.2d 102, 111-12 (Ind. Ct. App. 1975) (finding that non-waiver provision could not supersede the conduct of the parties, and that a party that accepted late payments at irregular times was now required to provide notice if it planned on terminating the agreement for a late payment); *Scott-Reitz Ltd. v. Rein Warsaw Assocs.*, 658 N.E.2d 98, 104 (Ind. Ct. App. 1995) ("[W]hen a party deviates from strict performance called for by the contract, the former cannot suddenly declare the deviation a breach of contract. . . . Notice must be given to the other party that strict performance will be required in the future, then if the party continues to deviate, a default can be declared.").  Here, it is Home Instead's actions, as well as inaction, that are alleged to have been a waiver.

[8] The parties agree that regardless of whether Indiana or Nebraska law applies to the Smith Parties' waiver defense, "the applicable standard and result would be the same."  [Dkt. No. 202 at 26, n.6 (Smith Parties) (quoting Dkt. No. 193 at 16, n.4 (Home Instead)).]

waiver is an affirmative act and mere silence, acquiescence or inactivity does not constitute waiver unless there was a duty to speak or act." *Id.* (citing *American Nat'l Bank & Trust Co. v. St. Joseph Valley Bank,* 391 N.E.2d 685, 687 (Ind. App. Ct. 1979).

The facts underlying the Smith Parties' waiver defense are not in dispute. In March, 2013, Home Instead first learned that the Smiths were operating an HHA under the name of "Home Again". Three months later, in June 2013, Home Instead confirmed that the Smiths were marketing Home Again as a sister company to Elder Care, d/b/a Home Instead.

In the fall of 2013, a Home Instead representative informed Mr. Smith that Home Instead was concerned with his use of the name "Home Again Senior Care." Mr. Smith responded that he would be happy to change the name of his HHA. For the year between November 2013 and November 2014. Ms. Morrison, Home Instead's attorney, engaged in oral and written conversations with the Smiths and their attorneys regarding the Smiths' use of the "Home Again name." In a January 16, 2014, Home Instead internal email, Ms. Richardson stated: "We have not put any constraints on him at th[is] point with regards to his Home Again business so he can continue to run his business as he has." [Young Dep. at Ex. 265.] On January 31, 2014, Ms. Morrison wrote to the Smiths' lawyer stating that "[t]he other concern we have is the similarity of the 'Home Again Senior Care' name to Home Instead Senior Care. As we discussed, and you agreed, the names are confusingly similar . . . even if we can work out the concerns with the services, at the very least the 'Home Again' name is going to need to be changed," and inviting additional information

19

or insights that the Smiths might have to help resolve Home Instead's concerns.  [Dkt. No. 23-1 at 7.]

In response to a March 31, 2014 email, Ms. Morrison requested an update as to "where [the Smiths] are in the process of changing the name of Home Again", to which the Smiths' attorney responded on May 21, 2014, as follows:

> I have convinced my clients to change the name of Home Again, but they would first like acknowledgement from Home Instead that Home Again's business is not competitive with a Home Instead business before making the name change. As soon as my clients receive the acknowledgement, they will make the name change.

[Dkt. No. 23-1 at 5.]  According to the Smiths, the next communication with respect to the name "Home Again" was the Notice of Termination in November 2014.

Our analysis is aided by an Indiana decision that is closely related to our case.  It concerns the immediate termination of a lease by a landlord who was aware of the nonpayment of rent and participated willingly in a delay of the nonpayment of rent.  In *T-3 Martinsville, LLC v. US Holding, LLC*, 916 N.E.2d 205 (Ind. Ct. App. 2009), the lessee failed to pay rent over one and a half years during which time the landlord engaged in discussions with the lessee about various options to remedy the deficiency.  The landlord filed a complaint for ejectment and immediate possession, which the trial court granted, ordering payment of all delinquent amounts owed or transfer of possession.  *Id.* at 206. The *T-3* Court on appeal held that:

> [A] review of Indiana case law supports our conclusion that after having actively participated in, contributed to, and facilitated the nonpayment of rent, Landlords may not suddenly terminate the Lease but are required to provide [lessee] with notice of default and an opportunity cure within a

20

reasonable amount of time notwithstanding [non-waiver provision] of the Lease.

*Id.* at 208 (lessee was lead to believe that the landlord did not intend to terminate the lease and therefore the landlord was "required to provide notice of default and an opportunity to cure before seeking to terminate the Lease"); *see also Pierce*, 330 N.E.2d at 111-12 (cited by *T-3 Martinsville, LLC*, 916 N.E.2d at 209) ("Further, as the failure to protest past late payments may have induced [lessee] into believing that similar late payments would be accepted without consequence, we conclude that said wavier would continue until such time that [lessee was] notified that prompt payment would be required."); *Keliher v. Cure*, 534 N.E.2d 1133, 1137 (Ind. Ct. App. 1989) ("A purchaser, following demonstration of a seller's acquiescence in delay, is entitled to expect the seller to continue to abide by the contract until notice is given to the contrary.").[9]

The relevant fact here is not that Home Instead continued to make the Smiths aware that the "Home Again" name needed to be changed, as Home Instead repeatedly argues in its briefing. Rather, it is Home Instead's failure to take steps to immediately terminate the

---

[9] Home Instead's reliance on *Dunkin' Donuts Inc. v. Panagakos*, 5 F. Supp. 2d 57 (1988) to support its argument that waiver requires "***clear, unequivocal, and decisive conduct showing an intent to waive its right***" [Dkt. No. 207 at 51 (emphasis in original)] is not apt. First, the Smiths cast doubt as to whether the Massachusetts waiver standard applied in *Panagakos* is analogous to Indiana law. Second, the *Panagakos* court looked to the affirmative conduct of Dunkin' Donuts when it did not immediately terminate its franchise with Panagakos, as we have examined Home Instead's affirmative conduct here. In *Panagakos*, Dunkin' Donuts initiated an audit and investigation immediately after Panagakos pled guilty to tax evasion. Upon his release from jail, Dunkin' Donuts revoked his franchise agreement. *Id.* at 61. The court held there was no waiver. Here, however, in our view Home Instead's affirmative conduct strongly indicates that it waived its right to terminate without notice and an opportunity to cure. Not only did Home Instead delay in terminating the Franchise Agreement, but it continued a course of communications with the Smiths that were casual and acquiescing, making no demand and setting no deadline regarding the necessity of the Smiths changing the Home Again name.

Franchise Agreement upon discovery of the unauthorized use of its trademark, instead allowing twenty months to pass, thereby leading the Smiths to believe, much as the lessee in *T-3 Martinsville* believed, that Home Instead did not intend to terminate the lease upon notice and without an opportunity to cure.  Simply stated, Home Instead cannot expect to be able to offer the Smiths a sense of security by ignoring a "material breach" of the Franchise Agreement for twenty months throughout which time period they from time to time mention in casual, passing fashion that the Smiths would at some unspecified point in the future need to change the name of their HHA and then suddenly, out of the blue, terminate the Franchise Agreement without providing the Smiths an opportunity to cure. Accordingly, we GRANT partial summary judgment on this issue in favor of the Smith Parties and against Home Instead, concluding that Home Instead wrongfully terminated the Franchise Agreement without providing the Smiths/Elder Care notice and an opportunity to cure their defaults.[10]

## 2.    Home Again/Purpose As a Competitor of Home Instead

Home Instead contends that Elder Care and the Smiths "violated the in-term non-competition covenants contained in the Franchise Agreement by . . . diverting the Franchised Business' clients and business to [Purpose]" and by the Smiths "having a beneficial and/or financial interest in [Purpose]."  [(Counterclaims, Count II against Elder

---

[10] This ruling resolves not only the Smith Parties' motion for summary judgment on this issue [*see* Dkt. No. 190], but also Home Instead's cross-motion with respect to its request for judgment that the termination of the Franchise Agreement was lawful [*see* Dkt. No. 193 at 11-15].  Likewise, we DENY Home Instead's request for summary judgment on Elder Care's claims which are premised on allegations of wrongful termination of the Franchise Agreement.  [*See id.* at 15-16.]

Care and the Smiths ¶¶ 60, 110-111.]  Two provisions of the Franchise Agreement restrict the Smiths from competing with Home Instead:  (1) the Smiths cannot own a "non-medical companionship and domestic care service business that is of a character and concept similar to the HOME INSTEAD SENIOR CARE Business", as described in § 17(C)(2) of the Franchise Agreement, and (2) the Smiths cannot "divert or attempt to divert any business or customer of the [Home Instead] to any competitor",[11] as specified in paragraph 7(C) of the Franchise Agreement.  We conclude based on the uncontroverted evidence before us, that Home Again is not a competitor of Home Instead, nor is it of a character and concept similar to the HOME INSTEAD SENIOR CARE Business.  Thus, the Smiths/Elder Care did not breach § 7(C) or § 17(C) of the Franchise Agreement.

Home Instead, by its own admissions, operates as a non-medical home care company (PSA) as opposed to a medical home care company (HHA).  [Hogan (Chief Development Officer for Home Instead) Dep. at 34; *see also* Dkt. No. 86 at 4 (quoting Home Instead materials repeating that its services are "exclusively non-medical").]  These are distinctly different scopes of operation and service, recognized to be so by the state licensure requirements and otherwise.  PSAs, like the Indianapolis-located Home Instead

---

[11] Home Instead advances a faltering argument that the Franchise Agreement must be ambiguous because "competitor" is undefined by that agreement.  [Dkt. No. 207 at 54-55.]  Contrary to Home Instead's position, undefined words are given their plain meaning, and neither party has demonstrated that a plain understanding of a "competitor" should not apply here.  [*See* Dkt. No. 226 at 12 (citing *Bedrosky v. Hiner*, 430 N.W.2d 535, 540 (Neb. 1988) ("The words used in the contract must be given their plain and ordinary meaning, as ordinary, average, or reasonable persons would understand them.").]  The Franchise Agreement is interpreted in any event in favor of the franchisee, since Home Instead authored the Franchise Agreement.  *See, e.g., Citizens Fin. Servs., FSB v. Inssbrook Country Club, Inc.*, 833 N.E.2d 1045, 1058 (Ind. Ct. App. 2005).

franchisees, cannot lawfully provide the medical services provided by an HHA because they are not licensed to do so.  [Diemer Decl. at ¶ 5; Irons Dep. at 20-21.]  The more sophisticated care provided by an HHA requires higher levels of compliance with state health regulations.  In fact, it is undisputed that the Franchise Agreement prohibited Elder Care from providing medical services.  [Franchise Agreement at § 2 ("The license and right granted by this Agreement is limited to the right to provide non-medical services . . . .").]  Home Instead has repeatedly argued that Elder Care and the Smiths *could have* (and *should* have) sought an amendment to the Franchise Agreement to allow them to obtain an HHA license and provide medical-based services through their Elder Care business, which argument actually defeats their contention.  In any event, there is no evidence that the Smith Parties were *required* to amend the Franchise Agreement to avoid breaching it; to impose such a requirement on a franchisee makes almost no sense.[12]

Home Again/Purpose operates as a home health agency (HHA) pursuant to HHA licensure and provides care based on a prescription or other order from a medical doctor the provision of which care is overseen by a licensed registered nurse.  [Dkt. No. 191 at 15-16 (An HHA license is necessary to perform skilled nursing services in the home[13] and

---

[12] Home Instead devotes a significant amount of ink to detailing the testimony of another Home Instead franchisee, Mr. Bunnell, relating to his interpretation of his Franchise Agreement and what he believed he could or could not do pursuant to its terms.  [Dkt. No. 226 at 10-11.]  We fail to see the relevance in Mr. Bunnell's testimony as it pertains to the Smith Parties' Franchise Agreement and their business with Home Again/Purpose.

[13] We acknowledge Home Instead's position that it is not the ordering of care by a physician that determines whether care can be provided by a PSA or must be provided by an HHA.  [Dkt. 291 at 17-18 (contending that a service is not *de facto* "medical" under the Franchise Agreement's definitions because it is ordered by a physician).]  Our conclusion is not based on whether a particular service is properly characterized as medical or non-medical, but rather on the nature of

at the direction of a registered nurse.)   The gravamen of an HHA, like Home Again/Purpose, is to provide medical-based home health care.  It is undisputed that Elder Care and other Home Instead franchisees were required to refer clients in need of medical-based home health care to an HHA and Home Instead franchisees did just that.[14]  [*See id.* at 34 (citing Home Instead franchisee testimony that Home Again/Purpose provided services Home Instead could not); 11/3/15 Morrison Dep. at 78-79.]

It is true that some of the home care that Home Again/Purpose provides as a licensed HHA overlaps with the care that a PSA, like Home Instead, can provide as *non*-medical-based home health care.  The gist of Home Instead's claim is that Home Again/Purpose was performing some non-medical home health care services that could have been (and should have been, says Home Instead) provided by Elder Care, which would have redounded to the financial benefit of Home Instead as the franchisor.  In addition to medical services, Home Again/Purpose provided services such as assistance with bathing, dressing, grooming, meal preparation, ambulation, light housekeeping, incontinence, and medication

---

an HHA, which is authorized by law to provide *medical* in-home care; a PSA's authorization is limited to providing *non-medical* in-home care.

[14] Certified HHAs, like Home Again/Purpose, can secure Medicaid reimbursement for prior authorization hours ("PA hours") used to provide in-home medical care, which are not available to PSAs like Home Instead.  Therefore, when a client has a medical need, Home Instead franchisees must refer the patient to an HHA, which then receives Medicaid reimbursement for all prescribed care.  It seems to us that Home Instead's concern stems from its belief that by creating Home Again, the Smiths would refer *all* PA-hour clients to Home Again and those clients would not be served by, or generate income for, Home Instead.  Home Instead attempts to distinguish the Smiths' arrangement from its other franchisees' referrals to HHAs on the basis that the Smith Parties obtained an HHA license to divert business from Home Instead.  It is axiomatic that the Smith Parties could divert business from Home Instead when Home Instead could not perform that work, a practice routinely allowed by Home Instead with all its franchisees.

reminders, all of which Home Instead describes in the Franchise Agreement as non-medical services.  By performing such services through Home Again/Purpose, says Home Instead, the Smith Parties diverted business from Home Instead to Home Again, in violation of the Franchise Agreement's non-competition clause.  [Dkt. No. 291 (Home Instead's Supp. Resp. Br. in Opposition to the Smith Parties' Mtn. for Partial Summ. J.) at 10 ("To be clear on the issues presented to the Court, the Smiths and Elder Care *did not* breach the Franchise Agreement's noncompetition covenants by operating a home health agency.  They breached the covenants because they provided services within Home Instead's scope of authorized services, including assistance with bathing, dressing, grooming, meal preparation, ambulation, light housekeeping, incontinence, and medication reminders, *through another business*.") (emphasis in original).]

This argument, however, does not carry the day.  Home Again/Purpose is not of a similar character and concept to Home Instead and is not Home Instead's competitor.  The Franchise Agreement's covenant not to compete prohibits the Smiths from operating a "non-medical companionship and domestic care service business", which Home Again/Purpose, as an HHA, clearly is not doing.  Consequently, the Smith Parties did not violate § 17(C)'s prohibition against the Smiths' owning a "non-medical companionship and domestic care service business that is of a character and concept similar to the HOME INSTEAD SENIOR CARE Business" and did not violate § 7(C) of the Franchise Agreement by operating Home Again/Purpose and referring business to its HHA.  *See*

Franchise Agreement § 7(C) (Prohibiting the Smith Parties from diverting or attempting "to divert any business or customer of the Franchised Business to any competitor . . . .").[15]

Accordingly, we GRANT partial summary judgment in favor of the Smiths/Elder Care and against Home Instead, ruling that the Smiths/Elder Care did not violate the Franchise Agreement's non-competition restrictions, § 7(C) and § 17(C)(1), by forming Home Again/Purpose and operating it as an HHA. Home Again/Purpose plainly does not compete with Home Instead.

**B.    Dual Employment – breach of non-disclosure provisions in § 7(B) and § 17(A)(10)**

Section 7(B) of the Franchise Agreement requires the Smith Parties/Elder Care to maintain the confidential information related to the franchise and to limit its use in specific ways:

> Franchisee and Franchisee's Principals do agree, that they: (1) will not use the Confidential Information in any other business or capacity; (2) will maintain the absolute confidentiality of the Confidential Information during and after the term of the Franchise; (3) will not make unauthorized copies of any portion of the Confidential Information disclosed in written form; and (4) will adopt and implement all reasonable procedures prescribed by Franchisor to prevent unauthorized use or disclosure of the Confidential Information, including restrictions on disclosure to employees of the Franchised Business and the use of nondisclosure and noncompetition clauses in employment agreements with persons. . . . Franchisee shall not, without the written consent of Franchisor disclose

---

[15] Although we are not convinced that the Operations Manual is incorporated into the Franchise Agreement, as Home Instead argues [Dkt. No. 207 at 34], its definition of non-medical services does not run afoul, but rather supports, our conclusion. Home Instead franchisees are permitted to provide non-medical care as described in the Franchise Agreement and further explicated in the Operations Manual. Yet, because Home Again/Purpose is licensed to provide in-home medical care not provided by Home Instead franchisees, those companies are not in competition with one another, and the Smith Parties did not divert business of Home Instead when it referred clients in need of medical care to Home Again/Purpose.

such information or use it for Franchisee's own benefit during the term of this Agreement and for a period of two (2) years thereafter, . . .

Home Instead claims that the Smiths/Elder Care breached this non-disclosure provision of the Franchise Agreement by "allowing and/or encouraging staff for [Elder Care], who have been trained using Home Instead, Inc.'s proprietary and confidential training materials, to provide services through [Purpose]." [Dkt. No. 191 at 35 (citing Counterclaims II).] The Smith Parties admit that a number of its Elder Care employee caregivers and its Elder Care administrative employees were jointly employed by Home Again/Purpose [*id.*]; however, such a dual-capacity arrangement for employees does not by itself violate the Franchise Agreement.

It is Home Instead's position that "a reasonable jury could determine that the Smiths Parties disclosed such [confidential information and trade secrets] through the use of dual employees." [Dkt. No. 207 at 58.] Home Instead asserts that that the Smith Parties used Home Instead handbooks, forms, and other documents to train Home Again employees. [*Id.* at 24, ¶¶ 10-11.] Yet, the record evidence reflects that persons hired by Home Again were not trained based on Home Instead materials. Elder Care shared with the Home Again employees only two documents, to wit, "the time off request form" (which Home Instead does not contend is confidential) and an Elder Care handbook that originated from a Home Instead template but was revised and changed to become Elder Care-specific. [Dkt. No. 209-7 (Home Again Dep.) at 38-39; Dkt. No. 209-5 (A. Smith Dep.) at 85-88.] The record before us therefore contains no evidence that any Home Again/Purpose employee, who was not previously a Home Instead employee, was trained using confidential or proprietary

28

materials belonging to Home Instead.  We GRANT summary judgment on this issue in favor of the Smith Parties.

### C.   Enforceability of Post-Termination Covenants

Home Instead also seeks to enforce the Franchise Agreement's post-termination covenants contained in § 17(C), which provide that "for a period of two (2) years following the expiration or termination of [the Franchise Agreement]" the Smith Parties are prohibited from (1) diverting any of Home Instead's business to any "competitor" and (2) owning or having a financial interest in "any non-medical companionship and domestic care service business that is of a character and concept similar to the HOME INSTEAD SENIOR CARE Business."  [SAC (Count I); Counterclaims (Counts I and II); Franchise Agreement § 7(C).]  The Smiths/Elder Care defend against this claim on the grounds that the post-termination covenants are overly broad in terms of time, geography, and activity restrictions and are, therefore, unenforceable.  [Dkt. No. 191 at 35-36.]

We do not consider the enforceability of § 17(C) in a vacuum.  Having determined that Home Again/Purpose is not a competitor of Home Instead nor embodying a business character and concept similar to Home Instead, we regard the issue of enforceability as § 17(C) moot.  Having determined that the Smith Parties' operation of Home Again/Purpose and their referral of clients to that entity as appropriate to the patients' needs does not violate § 17(C) as written, and further because the two-year time period restriction relating to this provision has expired, whether § 17(C) would otherwise be (un)enforceable is irrelevant.

**D.     Home Instead's Request for Attorneys' Fees**

The Smith Parties have moved to dismiss any claim for attorneys' fees that is rooted in a breach of the Franchise Agreement.  Home Instead clarifies that its prayer for attorneys' fees is based on its statutory claims, 15 U.S.C. § 1117 and Nebraska Revised Statutes § 87-303(b) [Dkt. No. 207 at 66], and not for an alleged breach of the Franchise Agreement, the Smith Parties' motion is DENIED as moot.

**II.     Lanham Act Trademark Infringement Claims**

Home Instead has brought claims against the Smith Parties for trademark infringement.  Under the Lanham Act, a party may assert claims for, *inter alia*, trademark infringement, 15 U.S.C. § 1114(1), or unfair competition, 15 U.S.C. § 1125(a), yet the central issue in both theories "is the likelihood of consumers in the relevant market [to] confus[e] the infringer's mark with that of the complainant."  *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir. 1993).  A threshold determination, therefore, in a trademark infringement claim is the validity and legal protectability of mark at issue, here, Home Instead® and Home Instead Senior Care®.  The parties do not dispute the validity of these marks or their protectability.

The Smiths move for summary judgment on Home Instead's trademark infringement claims (Home Instead does not), which can be divided into two categories: alleged infringement that occurred prior to its termination of the Franchise Agreement and infringement that occurred after the termination of the Agreement.

### A.    Pre-termination infringement

The Smith Parties move for summary judgment on Home Instead's pre-termination trademark infringement claim on two grounds, to wit, that Home Instead acquiesced in the Smiths' use of the name "Home Again" and that no evidence has been adduced that establishes a likelihood of confusion between the Home Instead name and Home Again.[16]

### 1.    Acquiescence

The Smith Parties contend that Home Instead acquiesced in its use of the name "Home Again" to identify and operate its HHA until November 7, 2014, when Home Instead terminated the Franchise Agreement.  The parties essentially address this issue by tracking the same analysis advanced by the Smith Parties in their waiver defense to Home Instead's termination of the Franchise Agreement.  However, these two defenses are not identical.  The most notable difference is that the defense of acquiescence in a trademark context requires a showing of a particular kind of prejudice that is not present in the evidence cited by the Smith Parties.

In the trademark context, "acquiescence implies active consent to an infringing use of the mark and requires a defendant to establish that (1) the senior user actively represented it would not assert a right or a claim; (2) the delay between the active

---

[16] The Smith Parties' argument that they were permitted to use Home Instead's trademarks during the term of the Franchise Agreement and therefore all pre-termination Lanham Act claims should be dismissed is incorrect as a matter of law.  [*See* Dkt. No. 191 at 46-47.]  The Smith Parties were granted a limited license to use Home Instead's trademarks in conducting Elder Care's business. [Franchise Agreement § 6(A).]   The Smith Parties' use of Home Instead's trademarks in the alleged modified form "Home Again", which was allegedly confusingly similar to the Home Instead mark, is the subject of Home Instead's trademark infringement claim.

representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Bobak Sausage Co. v. A&J Steven Bridges, Inc.*, 805 F. Supp. 2d 503, 513 (N.D. Ill. 2011).  The defenses of laches and acquiescence are often used interchangeably in trademark caselaw, although laches typically focuses on passive consent while acquiescence involves active consent.  Both defenses, however, require a finding of undue prejudice to the defendant as a result of the delay.  *See Profitness Physical Therapy Center v. Pro-Fit Orthopedic & Sports Physical Therapy*, 314 F.3d 62, 67 (2d Cir. 2002).  "Courts have identified two types of prejudice caused by delay:  (1) evidentiary; and (2) economic."  6 McCarthy on Trademarks and Unfair Competition § 31:12 (4th ed. 2017) (citations omitted).  The Smith Parties have advanced no argument that they suffered evidentiary prejudice from Home Instead's delay, so we will address their argument in terms of economic prejudice.

In considering the undue economic prejudice prong of the defense of acquiescence in trademark cases, the Fifth Circuit, after collecting relevant cases, recently held that: "undue prejudice means that the defendant has taken steps such as making significant investment decisions or building the bulk of its business based on the reasonable assumption that it had permission to use the plaintiff's marks, and that such investment or capital would be lost if the defendant could no longer use the mark."  *Penzoil-Quaker State Co. v. Miller Oil & Gas Operations*, 779 F.3d 290, 296 (5th Cir. 2015); *see also id.* at 297 (noting that "the Seventh Circuit found dispositive the fact that the defendant had 'spent millions of dollars annually promoting its [plaintiff]-endorsed products and has acquired a position as a market leader") (citing *Chattanoga Manuf., Inc. v. Nike, Inc.*, 301 F.3d 789

32

(7th Cir. 2002)).  "[P]rejudice is rarely, if ever, found merely because the defendant has *used* the infringing mark in commerce (or spent money on products which use the mark). This makes sense – if the use itself could satisfy the undue prejudice prong, that element would be rendered moot."  *Id.* at 298 (citations omitted).

The Smith Parties identify several ways in which they were unduly prejudiced by Home Instead's delay in asserting its right to its marks; however, none satisfies the undue prejudice element required to succeed on a defense of acquiescence.  The Smith Parties argue that they "continued to operate Elder Care and Purpose for over the course of a year-and-a-half," contending that their "potential liability" was increased during this time.  [Dkt. No. 191 at 49.]  The Smiths/Elder Care also contend that they were prejudiced by the "abrupt termination" of the Franchise Agreement, which "deprived them of an orderly transition from Home Again to their new marks and new trade name."  [Dkt. No. 226 at 21.][17]  These allegations of prejudice fall well short of the legal requirements.  As stated above, continued use is not a sufficient basis for a claim of prejudice (*Penzoil-Quaker State*, 779 F.3d at 298) and the Smiths had no legal entitlement to an "orderly transition" from their continued use of an allegedly infringing mark.  If increased liability, willingness, and deprivation of an orderly transition were enough to satisfy the "prejudice" prong of an acquiescence defense, this required element would be moot because these circumstances are surely present in all cases involving trademark holder delays in asserting its rights.

---

[17] The Smith Parties also argue that they "indicated a willingness to change the name."  [Dkt. No. 191 at 49.]  Their willingness to change the name of their HHA from "Home Again" to a different name does not evidence prejudice; rather it is an indication that they were not economically prejudiced by the delay, since they apparently remained willing to change the name.

Because the Smith Parties have failed to demonstrate that they suffered undue prejudice of an economic nature as a result of Home Instead's delay in asserting its trademark rights, we need not explore whether Home Instead actively represented that it would not assert its trademark rights against the Smith Parties or whether the delay between its representation and assertion of its right was excusable. The Smith Parties' Motion to Summary Judgment on Home Instead's Lanham Act claim on the basis of acquiescence is therefore DENIED.

### 2.   No confusion

The primary purpose of trademark law is to prevent confusion among consumers about the source of products or services. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992); *G. Heileman Brewing Co., Inc. v. Miller Brewing Co.*, 873 F.2d 985, 997 (7th Cir. 1989). "A trademark, even a registered one, is not a property right, like a copyright or a patent, but merely an identifier of source. Others can use the same mark to identify their product, provided there is no likelihood of confusion, which would impair the trademark's function as an identifier." *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996) (citations omitted). The Smith Parties move for summary judgment on Home Instead's pre-termination trademark infringement claims on the grounds that there was no likelihood of confusion between its "Home Again" name and the "Home Instead" trademark.

The Seventh Circuit routinely employs a seven-factor strength of the mark analysis in evaluating likelihood of confusion. *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir. 1993) (outlining factors). The Seventh Circuit's factors for

34

determining likelihood of confusion are as follows:  (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the complainant's mark; (6) actual confusion; and (7) intent of the infringing party to "palm off" his product as that of the other party. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.* 128 F.3d 1111, 1114-15 (7th Cir. 1997) (citation omitted).  "None of these factors considered alone is dispositive of the matter, and the weight each is to be accorded varies from case to case." *Id.*

The Smith Parties have dispensed with an analysis of the seven likelihood-of-confusion factors established by the Seventh Circuit Court, focusing instead solely on whether Home Instead can prove *actual* confusion.  Criticizing Home Instead's lack of survey evidence to support its trademark infringement claims,  the Smith Parties rely on Elder Care and Purpose employees' (hearsay) testimony that their clients were not confused by the similar names.  [Dkt. No. 191 at 49-52.]  However, as has oft been repeated by courts in this Circuit, likelihood of confusion can exist without any evidence of actual confusion.  *See Int'l Kennel Club of Chicago v. Mighty Star, Inc.*, 846 F.2d 1079, 1090 (7th Cir. 1988) (citing *Helene Curtis Indus. v. Church & Dwight Co.*, 560 F.2d 1325, 1330 (7th Cir. 1977)).  The Smith Parties' attempt to prove that no likelihood of confusion existed based solely on the ground that evidence of actual confusion exists, therefore, fails as a matter of law.

Even so, the Smith Parties themselves identify instances of actual confusion.  Their attempts to explain away these examples as anecdotal, a "handful of incidents", or an

35

"unfortunate coincidence" raise red flags signaling a genuine issue of material fact to be left to a jury's determination. [*See* Dkt. No. 191 at 51; Bunnell Dep. at 53:14-20.] For example, Stacey Jones, a Home Again employee, testified that the daughter of a client who received services from both Elder Care and Home Again/Purpose, referred to both service providers "as Home Instead, even if we corrected her." [Jones Dep. at 44:2-45:17.] "[N]o matter how many times" Ms. Jones reportedly tried to explain to the client that her mother was receiving care from both Elder Care and Home Again, "she always referred to it as Home Instead." [*Id.*] An email between two Elder Care employees references a client who "called to see if she was [a] home again or home instead client." [Dkt. No. 191 at 52 (citing Dep. Ex. 168).] Moreover, Mr. Smith testified that he chose the name "Home Again" in establishing his HHA so that it could be as close to Home Instead as possible, allowing him to market the two companies together. [Dkt. No. 61-3(Rozgay Decl.) at ¶ 7.]

It is the fact-finder's role to weigh the evidence and determine whether likelihood of confusion existed based on the evidence, including evidence of a handful of incidents of actual confusion. Summary judgment in these circumstances is not appropriate. For likelihood of confusion to be resolved on summary judgment, the evidence must be "so one-sided that there can be no doubt about how the question should be answered." *Door Sys.*, 83 F.3d at 171; *see also AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993) ("[A] motion for summary judgment in trademark infringement cases must be approached with great caution."). Not only have the Smith Parties failed to present evidence or argument in support of their position that Home Instead could not prove a likelihood of confusion, but their own references in the record of actual confusion defeats

36

this claim.  As a result, we DENY the Smith Parties' Motion for Summary Judgment on this basis.

### B.  Post-Termination[18]

It is undisputed that after Elder Care stopped performing on the Franchise Agreement on February 4, 2015, Elder Care and the Smiths were not authorized to use Home Instead's trademarks.  [Dkt. No. 191 at 53; Dkt. No. 207 at 73; Dkt. No. 226.]  The Smith Parties' motion is aimed at securing summary judgment for its incidental use of the name "Home Instead" after it ceased performing under the Franchise Agreement (February 4, 2015) and its use of the name "Home Again" after it agreed to cease using that name (April 1, 2015).

The Smith Parties merge two trademark infringement defenses in support of their motion for summary judgment.  They argue that their use of the names, Home Instead/Home Again, during the relevant time periods constituted "fair use" because they were used "otherwise than as a mark."  [Dkt. No. 191 at 54 (citing 15 U.S.C. § 1115(b)(4) (fair use defense)).]  They also contend that the offending names were not used in commerce by being displayed in the sale or advertising of services.  [*Id.* (citing 15 U.S.C. § 1127 (Construction and definitions; definition of "use in commerce") and *Hancock Park Homeowners Assoc. v. Hancock Park Home Owners Assoc.*, 2006 WL 4532986 (C.D. Cal. Sept. 20, 2006)).]  For these reasons, say the Smith Parties, Home Instead's trademark

---

[18] Home Instead has conceded that the Smith Parties' use of the phrase "formerly known as Home Instead" is a nominal use and it does not seek damages under the Lanham Act for such use.

infringement claim for their use of the name "Home Instead" after February 4, 2015 and the use of the name "Home Again" after April 1, 2015, fails as a matter of law.

### 1.    Fair Use

The Smith Parties' § 1115(b)(4) fair use defense is inapplicable here.  The fair use defense "is based on the principle that no one should be able to appropriate descriptive language through trademark registration." *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 951 (7th Cir. 1992).  An alleged infringer may invoke the "fair use" defense by demonstrating that the alleged infringement "is a use, otherwise than as a mark . . . which is descriptive of and used fairly and in good faith only to describe the goods or services of such party . . . ." *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 639 (7th Cir. 2001) (citing 15 U.S.C. § 1115(b)(4)).  "To prevail on the fair use defense, defendants must show that: (1) they used [the name] in a non-trademark use; (2) the phrase is descriptive of their goods or services; and (3) they used the phrase 'fairly and in good faith' only to describe their goods or services." *Id.*

The circumstances surrounding the Smith Parties' use of the name Home Instead after February 4, 2015 and the name Home Again after April 1, 2015 do not implicate a fair use defense.  Home Instead notes, and we agree, that the Smith Parties did not attempt to prove the last two prongs of a fair use defense (that the names were descriptive of their services and they used the names in good faith to describe their services), likely because it is the Smith Parties' defense, analyzed below, is that they *didn't* use these names to describe their services.

### 2.      Use in Commerce

"In order to satisfy the use-in-commerce requirement [of a Lanham Act claim], the infringing acts need not have actually taken place in commerce—they need only have an adverse effect on commerce." *Slep-Tone Enter. Corp. v. Sellis Enters, Inc.*, 87 F. Supp. 3d 897, 906 (N.D. Ill. 2015) (citations omitted). "To that end, the use-in-commerce element is satisfied if a defendant uses a plaintiff's mark for the purpose of providing a service." *Id.* at 906-07 (citing 15 U.S.C. § 1127). The Smith Parties address each instance of alleged infringing use after the applicable time periods raised by Home Instead. [*See* Dkt. No. 191 at 54-56 (email signature blocks, endorsed check, email correspondence with state agencies, and secretary of state identification).]

Directing our attention to two paragraphs in its Statement of Material Facts in Dispute brief, Home Instead broadly contends that "there are numerous examples of forward 'trademark' uses of the names Home Instead Senior Care and Home Again Senior [Care] after February [4], 2015 and April 1, 2015, respectively." [Dkt. No. 207 at 74 (citing *id.* § II(C)(51) & (53), *supra*).] Yet, the vast majority of Home Instead's evidence demonstrates that the Smith Parties were not using the names at issue to promote their services. For example, "an Elder Care employee used Home Instead Senior Care® time cards," an "Elder Care representative fielded questions about the name change," "a referral source . . . provided referrals to the Smiths' businesses as 'Home Instead'", "individuals and entities emailed the Smith Parties at their homeinstead.com email address," and a few instances of client confusion as to which entity was providing services. [*Id.* at 45-47.]

39

None of these incidental and non-commercial uses can properly be characterized as satisfying the "use-in-commerce requirement" of the Lanham Act.

That said, the Smith Parties do not dispute evidence that they used Home Instead/Home Again as a trademark use after the relevant dates. For example, on March 11, 2015 an Individual Service Plan was signed by an employee indicating her title as "Home Instead Senior Care Representative." The Smith Parties attempt to explain away this use of the name "Home Instead" on the ground that it was used by an hourly employee shortly after the name transition. [Dkt. No. 226 at 29.] In another instance, Mr. Smith introduced himself as "Anthony Smith from Home Again Senior Care" in a telephone call with a non-profit entity and also made charitable contributions using the name Home Again, both of which the Smith Parties explain as permitted uses since the non-profit was not a client. Similarly, a client journal bearing the Home Instead Senior Care logo was left at a client's home for some period of time lasting through June 2015, which the Smith Parties contend was simply in error. We are skeptical that Home Instead has suffered any appreciable damages from these isolated, errant uses of the Home Instead/Home Again names. However, based on this evidence and for purposes of the Smith Parties' motion for summary judgment, we cannot conclude that *all* of their post-February 4, 2015 and April 1, 2015 uses were "otherwise than as a mark" and had no adverse effect on commerce. Accordingly, we DENY the Smith Parties' Motion for Summary Judgment on Home Instead's post-termination Lanham Act claims.

### C.    Counterfeiting

The Smith Parties seek summary judgment on Home Instead's claim of trademark counterfeiting, a claim that allows for enhanced damages and attorney's fees and costs in addition to trademark infringement damages when an infringer uses a "spurious mark" identical or substantially indistinguishable from a registered mark.  In the absence of controlling Seventh Circuit precedent, the Smith Parties urge us to follow a Sixth Circuit decision that a hold-over franchisee's use of a formerly-licensed trademark may be copyright infringement, but does not constitute counterfeiting.  [Dkt. No. 191 at 60 (citing *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 11185, 1190 (6th Cir. 1997)).]  The *Structures* decision has been favorably cited previously by several U.S. district courts, including this one.  [*See id.* at 60-61 (citing *Coldwell Banker Real Estate, LLC v. DC Prop. & Loans, Inc.*, No. C 13-4732 SBA, 2014 WL 5474584, at *9 (N.D. Cal. Oct. 27, 2014); *Motor City Bagels, L.L.C. v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 489 (D. Md. 1999); *Pennzoil-Quaker State Co. v. Smith*, No. 2:05CV1505, 2008 WL 4107159, at *22 (W.D. Pa. Sept. 2, 2008)).  The Smith Parties exaggerate, however, our prior reliance on *Structures*.  In *Alpha Tau Omega Fraternity, Inc. v. Pure Country, Inc.,* 2004 WL 3391781, at *4 (S.D. Ind. Oct. 26, 2004), we cited *Structures* for the proposition that where a hold-over licensee used the trademark that it was previously authorized to use, such use created a likelihood of confusion sufficient to support a trademark infringement claim.  We drew no conclusions in the *Alpha Tau Omega* case with regard to counterfeiting; indeed, counterfeiting was not even mentioned in that decision.

41

Home Instead, on the other hand, urges us to follow a Northern District of Indiana decision in *Century 21 Real Estate, LLC v. Destiny Real Estate Props.*, which rejected *Structures* and held that "[t]he Court can conceive of no reason why an ex-franchisee should escape liability for counterfeiting simply because that person had access to a franchisor's original marks because of the former relationship and therefore did not need to reproduce an identical or substantially similar mark." No. 4:11-CV-38 JD, 2011 WL 6736060, at *3 (N.D. Ind. Dec. 19, 2011). In so holding, the district court acknowledged a lack of Seventh Circuit precedent on point, relying on the Seventh Circuit's treatment of counterfeiting generally. *Id.* at *4. In *General Electric Company v. Speicher*, the Seventh Circuit held that "[t]he happenstance of having trademarks made by the owner in one's possession, so that one doesn't have to copy them, has no relevance to the purposes of the [counterfeiting] statute. Indeed, the danger of confusion is even greater because the 'imitation' is not merely colorable, but perfect." *Id.* (citing 877 F.2d 531, 535 (7th Cir. 1989)). The *Century 21* court concluded that *Structures* does not provide reliable guidance in the Seventh Circuit in light of *Speicher* and that the unlicensed use by a hold-over franchisee constitutes the use of counterfeit marks. *Id.* at *5.

We find the analysis of the court in the *Century 21* case persuasive and consistent with Seventh Circuit precedent. The Smiths/Elder Care thus cannot escape liability for the use of counterfeit marks on the basis that they are a hold-over franchisee. The Smith

Parties' motion for summary judgment on Home Instead's counterfeiting claim is DENIED.[19]

## III.   Transfer Agreement Claims

In one of its last arguments, covering the final five pages of a 68 page brief, the Smith Parties seek judgment on an amalgamation of claims they reference as the "Transfer Agreement Claims." There are no such claims explicitly delineated in either the Second Amended Complaint or the Amended Counterclaims. Rather, in their SAC, the Smiths and Elder Care request a declaration that "the Transfer Agreement is valid and enforceable and that the transfer of clients from Elder Care to Care Choices does not constitute a misappropriation of trade secrets and is not otherwise unlawful as a matter of law." [SAC Count IV; *see also generally* Counterclaims ¶¶ 74-85, 125-36, 188-97 (misappropriation of trade secrets).] The Smiths and Elder Care also move for summary judgment on Home Instead's Count II against them alleging a violation of the non-disclosure covenants of the Franchise Agreement by "knowingly and intentionally disclosing, selling, and transferring the client list and information to Care Choices" and "maintaining a financial or beneficial interest in Care Choices." [Counterclaims ¶¶ 61(d), 64, 111(e), 115.] It is significant to note that Care Choices is a *Home Instead* franchisee, not a competitor of Home Instead. The Smiths Parties therefore did not disclose Elder Care's client list to a competitor; rather,

---

[19] The Smith Parties make a one-paragraph argument that there is no evidence that the services they provided during the "one-week holdover period" were of a lesser quality than had been provided by Elder Care as a franchisee. [Dkt. No. 191 at 61.] The Smith Parties' argument is conspicuously undeveloped, but nonetheless goes to the amount of damages allegedly suffered by Home Instead, as opposed to liability. Moreover, as we discussed *supra*, a disputed material fact exists regarding whether the Smiths' hold-over use constituted trademark infringement.

Elder Care's clients and their information were transferred to Home Instead itself via its franchisee, Care Choices.

The Smith Parties' request for summary judgment is roughly divided into two theories: (1) that they did not breach the non-disclosure covenant in the Franchise Agreement by transferring the Elder Care client list to Care Choices (in which they argue that the client list is not a trade secret) and (2) that they did not violate the Franchise Agreement by having a financial interest in the Transfer Agreement.

## A.   Non-Disclosure/No Trade Secret

The Smith Parties offer a tripartite argument in support of their position that transfer of Elder Care's client list to Care Choices did not breach the non-disclosure provision of the Franchise Agreement: (1) the client list was not an asset of Home Instead; (2) Home Instead's client list is not a trade secret; and (3) the client list had been provided to Home Instead with Elder Care's monthly reports and Elder Care's patients were constructively "returned" to Home Instead through its Care Choice's franchise.[20] [Dkt. No. 191 at 62-65.]

---

[20] It is unclear how Elder Care/Smiths' argument that they had already provided their client list to Home Instead has any bearing on whether they improperly disclosed their client list to Care Choices. Whether Elder Care and the Smiths failed to provide their client list to Home Instead is a separate claim for breach of the Franchise Agreement unrelated to a specific claim that the Transfer Agreement violated the Franchise Agreement. [*See* Franchise Agreement § 17(A)(9).] The equitable defense that Elder Care "returned" its clients to the Home Instead franchise system could result in a jury concluding that Home Instead suffered no damage from Elder Care's alleged technical breach of the Franchise Agreement; however, that issue is not before us on summary judgment.

Our first question is this:  to whom did the client list belong?  Elder Care contends that it owns its client list on the ground that it cultivated and serviced its clients, and building that book of business.  In support of its position, Elder Care points to Home Instead's own words that one of a franchisee's most important assets is its "book of business" and its employees.  [Dkt. No. 191 at 62 (citing "Seller's Transfer Guide") (identifying "customer lists" as a "business asset").]  In rejecting Elder Care's claim that the client list belonged to it, Home Instead rejoins that the Franchise Agreement expressly includes "list of customers" among the "Trade Secrets" that belong to Home Instead. [Franchise Agreement § 7(B).]

"Customer lists" are referenced in the Franchise Agreement in two places.  The Franchise Agreement restricts Elder Care and the Smiths' use of Confidential Information, generally prohibiting them from using "Confidential Information" for unfair competition. [*Id.*]  In that section, and for purposes of the Franchise Agreement, "'Trade Secrets' shall mean, information or data about [Home Instead] or any of its products, including but not limited to, . . . list of customers . . . that: (a) derives economic value, actual or potential, from not being generally known to, or generally ascertainable by proper means by other persons who can obtain economic value from their disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  [*Id.*]  In § 18(B), a section governing Home Instead's right to purchase the assets of the Elder Care business, the parties agreed to the following:

> [Elder Care] agrees that customer lists are Trade Secrets of [Home Instead] and [Elder Care] shall receive no value whatsoever for current customers, customer lists, or for any business generated by [Elder Care].

45

[*Id.* § 18(B).]

Customer lists are clearly identified as trade secrets and confidential information in the Franchise Agreement.  Although the Franchise Agreement appears to be in conflict with regards to treatment of the client list, the Franchise Agreement values the client list differently depending on the transaction at issue.  When Elder Care sells its business to someone other than Home Instead, Elder Care's book of business is its most important asset.  [*See* Seller's Transfer Guide.]  The process of selling, however, is one that is regulated by the Franchise Agreement, specifically § 14, which requires approval from Home Instead.  [Franchise Agreement § 14(B), (C).]  Here, Home Instead did not give the Smiths/Elder Care permission to sell their business to Care Choices.  On the other hand, when Elder Care sells its assets to Home Instead, Elder Care will receive no value for its customer lists/business.  [*Id.* § 18(B).]  A reasonable jury could find that based on the Franchise Agreement, Elder Care's customer list belonged to Home Instead.[21]

Home Instead makes short work of Elder Care/Smiths' second contention that their customer list is not a trade secret.  Although customer lists typically do not receive trademark protection under Indiana law, *Steenhoven v. College Life Ins. Co. of Am.*, 460 N.E.2d 973, 975 n.7 (Ind. Ct. App. 1984), the customer list at issue is more than simply a list of customer's names; it includes a host of additional information, including "phone

---

[21] Moreover, in their Supplemental Brief in Support of their Motion for Summary Judgment, the Smith Parties designate evidence of internal Home Instead communications indicating that Home Instead treated the client list as an asset of the franchisee (Elder Care), which further supports our conclusion that material facts are in dispute as to the owner of the client list which are better left for a jury's determination.  [*See* Dkt. No. 276 at 12-13.]

numbers, primary contact information and information about client decision makers, the last four digits of social security numbers, assigned case managers, service dates, service types, total hours serviced, alternative contacts and contact information, and client schedules." [Dkt. No. 207 at 78 (citing Barney Decl. at ¶¶ 31, 33, 34, 36, 37, 39-44).] The Smith Parties also disclosed to Home Instead via Care Choices the "caregiver names, hire dates, discipline, start date, addresses, phone numbers, email, pay rates, social security cards, insurance cards, TB testing information, and driver's licenses." [*Id.* (citing Barney Decl. at ¶¶ 32, 35, 38).] The Franchise Agreement required that this information be kept confidential; its value is told in major respects by Care Choices willingness to pay $500,000 to obtain this information. Accordingly, a reasonable jury could conclude that the client list information Elder Care sold to Care Choices was, indeed, a trade secret. *See Think Tank Software Development Corp. v. Chester, Inc.*, 30 N.E. 3d 738, 744 (Ind. Ct. App. 2015) (Protectable trade secrets have the following four characteristics: "(1) information, (2) which derives independent economic value, (3) is not generally known or readily accessible by proper means by other persons who can obtain economic value from its use, and (4) is the subject of efforts reasonable under the circumstances to maintain its secrecy.").]

For these reasons, we DENY summary judgment to the Smith Parties as to the "Transfer Agreement" claims.

### B.     Financial Interest

The Franchise Agreement prohibits the Smith Parties from having "any financial or beneficial interest" "or make loans to, any non-medical companionship and domestic care

service business that is of a character and concept similar to the HOME INSTEAD SENIOR CARE business." [Franchise Agreement § 17(C).] "Similar," as used in this section, is defined by the Franchise Agreement as "a business which looks like, copies, imitates or operates in a manner similar to a HOME INSTEAD SENIOR CARE Business, including, but not limited to, any non-medical services business, and which business is, or is intended to be, located at the location of the HOME INSTEAD SENIOR CARE Business." [*Id.*] Home Instead contends that the Smiths and Elder Care violated § 17(C) when they entered into the Transfer Agreement with Care Choices, despite its being a franchisee of Home Instead. Care Choices agreed to make payments to Elder Care on an installment basis, which, says Home Instead, gave the Smith Parties an ongoing financial interest in Care Choices. [*See* Transfer Agreement.]

The Smith Parties move for summary judgment on Home Instead's claim on the grounds that Care Choices is not a "non-medical companionship and domestic care services business that is of a character and concept *similar to*" Home Instead; rather, it *is* a Home Instead business. According to the Smith Parties, Care Choices *is* Home Instead, and thus, the restrictive covenant is inapplicable. We agree.

The purpose of a restrictive covenant of this nature is to prevent unfair competition by restricting a former franchisee from having an interest in a non-Home Instead business within two years following the expiration or termination of its agreement with Home Instead. The plain language of the Franchise Agreement is clear: the Smiths and Elder Care are prohibited from having an interest in a business that looks like, imitates, or operates in a manner similar to a Home Instead business. Because Care Choices is not

imitating or operating in a manner similar to a Home Instead business, but rather it *is*, in fact, a Home Instead business, the Smiths/Elder Care did not compete with Home Instead by having an interest in Care Choices. Thus, they have not breached the non-competition provision of the Franchise Agreement by entering into the Transfer Agreement with Care Choices. We GRANT summary judgment in favor of the Smith Parties on this narrow issue – that having a financial interest in Care Choices is not violative of the Franchise Agreement's restrictive covenants.

## III.   Civil Conspiracy

The Smith Parties seek summary judgment on Home Instead's civil conspiracy claims. We dismissed without prejudice Home Instead's originally-pled claims of civil conspiracy on the grounds that the intracorporate conspiracy doctrine barred those claims. Home Instead defended its claims as originally plead, but replead its civil conspiracy claims prior to this ruling in an attempt to avoid the intracorporate conspiracy doctrine by alleging that the Smiths were operating outside the scope of their corporate authority or other than in the normal course of their corporate duties. The Smith Parties have made no showing that they are entitled to summary judgment based on Home Instead's re-pleaded version of these claims. As a result, we DENY the Smith Parties' motion for summary judgment on Home Instead's civil conspiracy claims.

## IV.   The Smith Parties' Claim for Violation of the IDFPA (Count III of SAC)

Home Instead filed a motion for summary judgment on breach of the Franchise Agreement [Counts I and II], which we have resolved *supra*, and the Smith Parties' claim for violation of the Indiana Deceptive Franchise Practices Act.

49

### A.     The Termination Notice

The Indiana Deceptive Franchise Practices Act ("IDFPA") forbids franchisors from unlawfully coercing franchisees to "enter into any agreement with the franchisor . . . by threatening to cancel or fail to renew any agreement between the franchisee and the franchisor.  Notice in good faith to any franchisee of the franchisee's violation of the terms or provisions of a franchise or agreement does not constitute a violation of this subdivision."  Ind. Code § 23-2-2.7-2(1)(iv).  Elder Care contends that Home Instead's termination notice violated the IDFPA because Home Instead used it to unlawfully attempt to coerce Elder Care.  [SAC, Count III.]

The undisputed evidence reveals that Attorney Morrison sent the Notice of Termination to the Smiths and Elder Care terminating the Franchise Agreement effective three days from the date of the notice on November 20, 2014.  It is Home Instead's position that the Notice of Termination did not threaten to terminate the Franchise Agreement, rather; it did, in fact, terminate the Franchise Agreement.  Thus, Home Instead maintains that it did not violate the IDFPA.  [Dkt. No. 193 at 20-22; Notice of Termination ("[T]he Franchise Agreement and all Franchisee's rights under the Franchise Agreement shall terminate, without further notice, effective three (3) days from the date of this Notice, for the material breaches of the Franchise Agreement described above.").]

The Smiths and Elder Care rejoin that Attorney Morrison's email accompanying the Notice of Termination belies Home Instead's contention.  Morrison stated:

50

Accordingly, attached is the notice letter that addresses these defaults along with the settlement agreement that sets forth the sales plan we intend to implement in order for us to suspend our rights to immediately terminate your clients' franchise agreement. As indicated, we will agree to suspend our right to terminate your clients' franchise agreement for violating the in-term non-competition provisions of the franchise agreement and for trademark infringement, if your clients agree to and satisfy the conditions set forth in the attached settlement agreement. Provided your clients agree to the terms and conditions set forth in the settlement agreement, we will agree to suspend our termination rights for a certain period of time to allow them to sell the business. However, as we discussed, if we cannot come to an agreement, the franchise agreement will be terminated and we will file litigation to enforce termination of the franchise agreement, enforce compliance with the post-term covenants contained in the franchise agreement, and for trademark infringement, if necessary. I have attached a copy of the Complaint we are prepared to file for your review. As I said on the call, we certainly do not want to have to go that route, which is why we are offering your clients the opportunity to sell their business and gracefully exit the system.

[Dkt. No. 131-2.]  Because Home Instead agreed to "suspend" its right to terminate "[p]rovided [the Smith Parties] agree to and satisfy the conditions set forth in the attached settlement agreement," the termination was not unequivocal as Home Instead would have this court believe, say the Smith Parties.

We hold that the Notice of Termination terminated the Franchise Agreement, rather than simply threatening to cancel it. Attorney Morrison's accompanying email does not change our conclusion. It is clear from Morrison's email that Home Instead proposed a settlement to allow the Smith Parties, granting a "certain period of time to allow them to sell the business" and "gracefully exit the system." Ind. Code § 23-2-2.7-2(1)(iv); *see also Hubbard Chevrolet Co. v. GM Corp.*, 682 F. Supp. 873 (S.D. Miss. 1987) ("'Coercion' or 'intimidation' requires a wrongful demand which will result in sanctions if it is not complied with. In fact, in the absence of a claim that the manufacturer warned the dealer to do or not do a particular act or face termination, there is no 'either-or' attempt at coercion or intimidation and hence there can be no recovery under the [A]DDCA, even if the dealer felt that he was being coerced.") (citations omitted); *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 911 (9th Cir. 1978) ("When a termination . . . of a franchise is

51

involved, there must be a 'causal connection' between the dealer's resistance to the coercive conduct and the termination.") (citation omitted).

Nothing in Attorney Morrison's email suggests that the Smiths could avoid termination through settlement.[22]   We therefore GRANT Home Instead's motion for summary judgment as to the Smith Parties' claim for violation of the IDFPA related to the termination notice.

### B.    Discrimination

Home Instead seeks summary judgment on the Smith Parties' claim that it violated the IDFPA by "attempting to prevent [the Smith Parties] from operating a medical home health agency providing services that Elder Care is not lawfully authorized to provide but allowing other Home Instead franchisees to operate businesses that provide similar non-medical services to those offered by Home Instead." [SAC ¶ 67.]

The IDFPA prohibits franchisors from "[d]iscriminating unfairly among its franchisees." Ind. Code § 23-2-2.7-2(5). "Discrimination among franchisees means that as between two or more similarly situated franchisees, and under similar financial and marketing conditions, a franchisor engaged in less favorable treatment toward the discriminatee than toward other franchisees." *Canada Dry Corp. v. Nehi Bev. Co.*, 723 F.2d 512, 521 (7th Cir. 1983). "Thus, proof of 'discrimination' requires a showing of arbitrary disparate treatment among similarly situated individuals or entities." *Id.*

---

[22] Because we have found that the Notice of Termination and Morrison's email did not threaten to terminate the Franchise Agreement, we need not reach the issue of the IDFPA's good faith safe harbor provision.

According to Home Instead, Elder Care cannot (and has not) identified any similarly situated franchisee that was treated differently than Elder Care.  [Dkt. No. 193 at 23-25.] "Whether a plaintiff/franchisee is 'similarly situated' to other franchisees will, of course, depend on which factors about the franchisees are compared." *Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.*, No. 1:12-CV-448-WTL-DKL, 2015 WL 2124994, at *5 (S.D. Ind. May 6, 2015) (citing *Implement Serv., Inc. v. Tecumseh Products Co.,* 726 F. Supp. 1171, 1181 (S.D. Ind. 1989)). "The factors compared should be those factors that are relevant to the underlying business decision being made." *Id.*  Here, the business decision at issue is the termination of Elder Care's Franchise Agreement, which occurred based on the Smith Parties violating the terms of the Franchise Agreement in two respects:  by (1) operating and diverting business to an alleged competitor, Home Again, and (2) using the name Home Again which was confusingly similar to and a modification of the Home Instead trademarks.  [*See* Termination Notice.]

One of Home Instead's arguments here is that it was improper for Home Again to provide the same services to the public as provided by Home Instead.  For example, the Smith Parties were not authorized by the Franchise Agreement to provide light housekeeping or incidental transportation through Home Again, and therefore must provide those services through Elder Care.  It is the Smiths/Elder Care's position that Home Instead allowed other franchisees to provide services similar to those provided by Home Instead through secondary businesses (a cleaning company and a transportation company), while prohibiting the Smiths from doing the same.  [SAC § 67.]

Even assuming there were franchisees operating a secondary cleaning company or transportation company who were similarly situated to Home Again, in that they provided services akin to those offered by Home Instead, there is no evidence that any such franchisees used a name that is confusingly similar to Home Instead or modified the Home Instead trademark.[23]  It is undeniable that one of the three stated reasons for Home Instead's termination of the Franchise Agreement was the Smith Parties' wrongful use of the name "Home Again."  No evidence has been presented that the home cleaning or transportation businesses used confusingly similar names or modified Home Instead's trademark.  *See Canada Dry Corp.*, 723 F.2d at 522 (rejecting discrimination claim and holding that evidence that some franchisees shared some of the deficiencies of the terminated franchisee is an inadequate comparison for purposes of demonstrating discrimination).   The Smith Parties do not explicate this distinction and as a result, we conclude that the Smith Parties have not demonstrated that Home Instead treated them less favorably than any similarly situated franchisee.  We GRANT Home Instead's Motion for Summary Judgment on the Smith Parties' Count III for Violations of the Indiana Deceptive Franchise Practices Act.

## Conclusion

For the foregoing reasons, we GRANT IN PART AND DENY IN PART the parties' cross motions for summary judgment, as follows:

---

[23] We dispense with an analysis of similarly situated franchisees related to violations for unfair competition for two reasons: we determined that Home Again was *not* a competitor of Home Instead and the Smith Parties' use of the name "Home Again", as discussed below, distinguishes Elder Care from other franchisees.

- GRANT summary judgment in favor of the Smiths/Elder Care that Home Instead wrongfully terminated the Franchise Agreement without notice and an opportunity to cure;

- GRANT summary judgment in favor of the Smiths/Elder Care that the Smiths/Elder Care did not violate the Franchise Agreement's covenant not to compete because Home Again/Purpose is not a competitor of Home Instead;

- GRANT summary judgment in favor of the Smiths/Elder Care that they did not breach the Franchise Agreement's non-disclosure provisions, § 7(B), § 17(A)(10), by allowing dual employment of employees;

- GRANT summary judgment in favor of the Smith Parties that having a financial interest in Care Choices did not violate the Franchise Agreement's non-competition provision;

- DENY the Smiths Parties motion to dismiss Home Instead's attorneys' fees claim as MOOT;

- DENY the Smiths/Elder Care's motion for summary judgment on Home Instead's Lanham Act claims related to: their acquiescence defense, that no confusion exists, and that they did not breach the post-termination covenants;

- DENY the Smith Parties' motion for summary judgment on Home Instead's counterfeiting claim;

- DENY the Smith Parties' motion for summary judgment on the "Transfer Agreement Claims";

- DENY the Smith Parties' motion for summary judgment on Home Instead's conspiracy claim; and

- GRANT summary judgment in favor of Home Instead on the Smiths/Elder Care's claims that the termination notice violated the IDFPA and that Home Instead discriminated against the Smiths/Elder Care.

The Magistrate Judge is requested to conduct a conference with the parties forthwith to organize the remaining issues and evidence in preparation for trial, if a settlement proves impossible.

**IT IS SO ORDERED.**

Date:   3/24/2017

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email generated by the court's ECF system.